HAROLD SEARCY *vs.* DAVID L. PAUL & others.[1]

Plymouth. February 5, 1985. — May 31, 1985.

Present: GREANEY, C.J., CUTTER, & FINE, JJ.

*Workmen's Compensation Act*, Recovery against third person. *Corporation*,
Corporate entity. *Negligence*, Ladder, One owning or controlling real
estate. *Evidence*, Relevancy and materiality, Judicial discretion.

In an action by a plaintiff who was injured when he fell from a ladder while
cleaning windows at an apartment complex against the individual owner
of the property, against a corporation, owned by the individual defendant,
which had been engaged as general contractor to complete the complex,
and against a second corporation, controlled by the individual defendant,
which was the managing agent for the complex, it was held that a lump
sum settlement agreement under the Workmen's Compensation Act be-
tween the plaintiff and the corporation acting as general contractor did
not bar the plaintiff from proceeding at common law against the individual
defendant and the second corporation. [138-140]
In an action by a plaintiff who was injured when he fell from a ladder while
washing windows at an apartment complex against the owner of the
property and a corporation, controlled by him, which was the managing
agent for the complex, there was sufficient evidence to warrant a finding
that an employee of the corporation had been negligent in furnishing
the plaintiff with a ladder which was the bottom half of an extension
ladder and which lacked friction feet, and that such negligence was a
proximate cause of the plaintiff's fall. [140-142]
At the trial of an action by a plaintiff injured when he fell from a ladder
while washing windows at an apartment complex, the judge did not err
in excluding certain evidence offered by the plaintiff to show that one
of the defendants, a bank holding a mortgage on the property, remained
in some degree the owner of the property after it had conveyed the
property to the individual defendant. [142-143]
At the trial of an action by a plaintiff injured when he fell from a ladder
while washing windows at an apartment complex, the judge did not err
in directing a verdict for the bank holding a mortgage on the property,
despite the plaintiff's claim that the evidence permitted an inference that
the bank was the actual owner of the complex. [142-143]

[1] D.L.P., Inc., and Home Owners Federal Savings and Loan Association.

CIVIL ACTION commenced in the Superior Court on April 5, 1976.

The case was tried before *Joseph Ford, J.*

*Edward J. Shagory (Beth H. Saltzman* with him) for David L. Paul & another.

*Edmund M. Pitts* for the plaintiff.

*Mary Holland Harvey* for Home Owners Federal Savings and Loan Association.

CUTTER, J. On April 8, 1975, Searcy was injured when he fell from a ladder while cleaning windows at an apartment complex (the complex), known as Brandywine Village, in Brockton. The action was originally brought on April 5, 1976, against Paul, individually and as doing business as Paul Properties. By amendments and substitute complaints, D.L.P., Inc. (DLP), a New York corporation; Vortex Construction Company (Vortex), a Massachusetts corporation; and Home Owners Federal Savings and Loan Association (Home Owners) were added as defendants. The complaints asserted negligence on the part of certain defendants in furnishing to Searcy an unsafe ladder.

On March 31, 1976, Searcy had filed a claim with the Industrial Accident Board (the board), under G. L. c. 152 (worker's compensation), asserting that he was an employee of Vortex. This claim was settled, with the board's approval, by Vortex's compensation insurer for a lump sum of $5,300 (G. L. c. 152, § 48). This sum was paid to Searcy, his attorney (who also represents him in this action), and medical providers.[2]

Among other defenses to the substitute complaints, the defendants asserted that Searcy was barred from proceeding at common law against them, respectively, by the lump sum settlement under G. L. c. 152. A pretrial motion for summary

---

[2] The lump sum settlement agreement made note that the insurer disputed its obligation to make disability payments and claimed that Searcy "was a self-employed independent cleaning contractor . . . and was not an employee covered under" G. L. c. 152. It was also noted that Searcy made the settlement "to avoid the risk that he would receive nothing . . . [on] this disputed claim" and "to make this lump sum agreement as to liability for future medical expenses and to give him something on hand for such expenses."

judgment (on the ground that the lump sum settlement barred relief in this action) was denied by one Superior Court judge, and later on February 8, 1983, was allowed by another judge as a defense protecting Vortex, but not other defendants. The action was dismissed as against Vortex.

At trial, the case was submitted to the jury on special questions against Paul and DLP under which Searcy was awarded $112,500.[3] The defendants' motions for judgment n.o.v. and for a new trial were denied. Paul and DLP have appealed. The judge directed a verdict for Home Owners. From the resulting judgment for Home Owners, Searcy has appealed. We state the principal facts underlying the claims asserted.

In 1974, Home Owners had acquired the complex by foreclosure when it was about sixty percent completed. By a duly recorded deed, Home Owners, on November 20, 1974, conveyed[4] the complex to Paul, a real estate developer, who operated real estate projects in several States as Paul Properties. Paul owned all the shares of Vortex, a corporation engaged in construction, and was its president. Paul was also president, and owned a majority of the shares, of DLP. Paul hired Vortex as general contractor to complete the complex. It could be found that Paul hired DLP as managing agent for the complex and that he selected one Joseph Roif (upon the recommendation of Home Owners or of persons connected with Home Owners) to oversee the construction work for Vortex and as manager-

---

[3] The jury found that Paul and DLP, each in control of the complex, were negligent to the extent of seventy-five percent. Searcy's total injuries were assessed at $150,000 by the jury. In answer to special questions, the jury also found: (a) DLP was in control of the complex as Paul's agent; (b) one Fagone was an employee of DLP and furnished the ladder to Searcy; (c) Fagone was negligent because the ladder did not have friction feet; (d) the lack of friction feet was a proximate cause of Searcy's fall; (e) Searcy was negligent to the extent of twenty-five percent.

[4] The circumstances attendant upon this conveyance and the details of the instruments then executed are material to Searcy's appeal from the directed verdict on his claim against Home Owners. This claim is discussed (and certain facts are set out with greater specificity) below in part 3 of this opinion.

operator of DLP.[5] Roif was the supervisor of Richard Record, also an employee of Vortex.

Searcy operated his own cleaning business. He was engaged[6] by Vortex to clean units in the complex (after their completion) at a price of twenty dollars per unit and started work a week or more before April 8, 1975, when the accident happened. Searcy was told by Record that he was also to clean some outside windows about twelve feet above the ground. Searcy protested that he "never did any . . . outside windows before and . . . [that he] wasn't equipped to do outside windows." Searcy also told Record that he "didn't have a ladder . . . [to use] to clean the windows." Record said the outside windows "had to be done before . . . [Searcy] could get paid," and that he would get Searcy a ladder.

Later David Fagone, an employee of DLP (who lived in one of the apartment buildings and did miscellaneous work in the complex) brought an aluminum ladder to Searcy and said that Record had sent it. This was the bottom section of a sixteen to thirty-two foot extension ladder. It could be found or inferred that friction feet for the bottom of the ladder were not attached at the time of the accident and that Searcy had not "alter[ed] the ladder at all that . . . Fagone gave" him.

Searcy used the ladder in cleaning windows for four or five days. Record testified that he warned Searcy "a couple of times," when he saw him, that the base of the ladder was too far

---

[5] There was no written agreement that DLP was to be Paul's agent in running the complex. An agency arrangement, however, could be inferred from the evidence, principally a somewhat diffuse deposition by Paul, not wholly internally consistent. In that deposition, Paul conceded that a sole proprietorship of his, Paul Properties, or "employees" of his, "ran . . . [the complex] at Brockton, whatever had to be done." In an answer to interrogatories, Paul said, "I was responsible for the hiring of general contractors to finish construction and lease the premises." Paul in his deposition described Roif as "the manager/agent of DLP most familiar with the facts" here involved.

[6] There was some difference of position reflected in the record about whether Searcy was an independent contractor or an employee of Vortex. Before the Industrial Accident Board Searcy filed his claim as an employee of Vortex. At trial there was evidence that he was an independent contractor retained in behalf of Vortex.

away from the side of the building, near which he then was working, to be safe. On April 8, 1975, Searcy placed the base of the ladder on a blacktop walkway about eight feet away from a building on which he was about to work. He was washing a window with his left hand, and holding onto the building with his right hand. His bucket was between his feet, which were on the fourth rung from the top. The ladder suddenly shifted and Searcy fell to the ground, with the bucket. He noticed that the rung on which he had been standing was bent and the ladder was twisted. He was seriously injured, sustained head and back injuries, and had broken bones in or near his feet and ankles. He was hospitalized for a substantial time and some of his injuries are permanent.

1. Paul and DLP contend that Searcy is barred from bringing this action because of the approved lump sum settlement with Vortex by him as an employee of that corporation. Vortex was named as an insured, together with DLP and Paul Properties (and other entities), by endorsement on Vortex's workers' compensation policy. The contention, in effect, is that Searcy (having made a lump sum settlement under G. L. c. 152, cannot sue Paul and DLP as third parties under c. 152, § 15, as amended by St. 1971, cc. 888 and 941,[7] because the relationships among Paul, DLP, and Vortex were such as to create "one [insured] multi-faceted construction company" and, consequently, one aggregate employer of Searcy.

Examination of the legislative history of St. 1971, c. 941 (see note 7, *supra*), discloses no interpretation of the chapter's purpose beyond the language of the section itself. Contemporary comment, however, shows that the statute was taken by text and periodical writers as broadly abolishing the so-called

---

[7] Chapter 941 added at the end of § 15, effective on January 24, 1972, the following language: "Nothing in this section or in section eighteen or twenty-four shall be construed to bar an action at law for damages for personal injuries or wrongful death by an employee *against any person other than the insured person employing such employee and liable for payment of the compensation provided by this chapter* for the employee's personal injury or wrongful death *and said insured person's employees*" (emphasis supplied).

"common employment" doctrine and permitting third-party actions by, or in behalf of, an injured employee against all but his immediate insured employer. See Locke, Workmen's Compensation Law 1972 Ann. Survey Mass. Law 50 §§ 4.1-4.3 (1972); Locke, Workmen's Compensation §§ 661-665, 668-674 (2d ed. 1981 & Supp. 1984); 2A Larson, Workmen's Compensation §§ 72.31(b)-72.40 (1983 & Supp. 1984). See also the concurring opinion of Braucher, J., in *Poirier* v. *Plymouth*, 374 Mass. 206, 229-230 (1978), and *Correia* v. *Firestone Tire & Rubber Co.*, 388 Mass. 342, 350-352 & n.9 (1983).

We apply the 1971 amendment as meaning just what it says, and as allowing a corporation's employee to bring actions for negligence against third parties, either individuals or corporations, even if in some degree affiliated with the insured employer corporation (at least where no joint venture with another defendant is established). This seems to be the trend of the cases elsewhere where legislation, generally comparable to the 1971 amendments of c. 152, § 15, has been enacted.[8]

We perceive no basis, in the present circumstances, for extending the Massachusetts decisions with respect to "disregarding the corporate fiction" so as to provide to a third party corporation immunity from an action by an employee of a somewhat affiliated corporation which has made a workers' compensation settlement with that employee. Here there has been shown (a) no flagrant or relevant disregard of corporate barriers by Paul and the several corporations of which he was an officer and shareholder and (b) no fraud. See *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, 353 Mass. 614, 618-

---

[8] See *Boggs* v. *Blue Diamond Coal Co.*, 590 F.2d 655, 658-663 (6th Cir.), cert. denied, 444 U.S. 836 (1979, Ky. law applied); *Latham* v. *Technar, Inc.*, 390 F. Supp. 1031, 1037-1039 (E.D. Tenn. 1974, Tenn. law); *O'Brien* v. *Grumman Corp.*, 475 F. Supp. 284, 290-293 (S.D. N.Y. 1979, Ga. Law); *Choate* v. *Landis Tool Co.*, 486 F. Supp. 774, 775-781 (E.D. Mich. 1980, Mich. Law); *Peterson* v. *Trailways, Inc.*, 555 F. Supp. 827, 830-833 (D. Colo. 1983, Colo. law); *Lyon* v. *Barrett*, 89 N.J. 294, 302-305 (1982), also 30 A.L.R. 4th 940 (1984), and annotation, *id.* at 948, and cases cited in each. Compare *Wallace* v. *Shade Tobacco Growers Agricultural Assn.*, 642 F.2d 17, 20-21 (1st Cir. 1981, applying Mass. law prior to the effective date of the 1971 amendments).

619 (1968); *Gordon Chem. Co.* v. *Aetna Cas. & Sur. Co.,* 358 Mass. 632, 637-639 (1971).[9]

We do not view *Vertentes* v. *Barletta Co.,* 392 Mass. 165, 167-170 (1984), and see concurring opinion at 176-177, as precluding a third-party action by Searcy against either Paul or DLP. Searcy, in seeking recovery against Paul, was trying to recover from Paul *as principal* for the negligence of DLP alleged to be Paul's *agent*. Searcy has not been shown to have been working for DLP either as employee or independent contractor. Nothing in G. L. c. 152 (after the 1971 amendments) extends any immunity to Paul, if DLP was his agent, because Vortex (insured under c. 152) had made a lump sum settlement with Searcy. Whether Searcy was an employee or independent contractor of Vortex, the 1971 amendments specifically permitted Searcy to bring a third party action for negligence against DLP or against Paul as principal if DLP was his agent.

2. It could be found that Paul, as owner of the complex, and DLP, as Paul's agent at the time of the accident on April 8, 1975, had sufficient control over the complex, to make it the duty of each of them to take "reasonable and appropriate" steps to prevent injury to persons lawfully on the premises of the complex regardless of the status entitling such persons to be there. See *Mounsey* v. *Ellard,* 363 Mass. 693, 707-709

---

[9] Paul and DLP, under the express language of the 1971 amendments, do not acquire immunity from third-party actions because they are "statutory employers" under G. L. c. 152, § 18. See Locke, Workmen's Compensation § 662 (2d ed. 1981). Vortex and DLP also were not joint venturers within the meaning of G. L. c. 152, § 1(5), as appearing in St. 1954, c. 265, defining "employer" as including two or more individuals or corporations "engaged in a joint enterprise." The record shows no agreement among Paul, DLP, and Vortex for an association among themselves for joint profit and for sharing losses, amounting to either a partnership among the entities or a joint venture. Indeed, at trial, the defendants' counsel strongly argued that there was no such joint venture. See the discussion in *Shain Inv. Co.* v. *Cohen,* 15 Mass. App. Ct. 4, 7-11 (1982), and cases cited. Stock ownership by Paul, and agency arrangements by him with DLP, do not amount to a joint venture. This action is against a corporation and an individual, each a separate entity from Vortex, Searcy's employer. There is no basis for application of the "separate capacity" doctrine discussed in *Longever* v. *Revere Copper & Brass Inc.,* 381 Mass. 221, 224-226 (1980). See *Liberty Mut. Ins. Co.* v. *Westerlind,* 374 Mass. 524, 527 (1978).

(1973); *Poirier* v. *Plymouth,* 374 Mass. 206, 228 (1978), and the cases reviewed in the concurring opinion in *Vertentes* v. *Barletta Co.,* 392 Mass. at 171-176. We think that Searcy, whether an employee of Vortex or an independent contractor of Vortex, was lawfully on the premises owned by Paul and managed by DLP which could be found to be Paul's agent.[10]

Paul and DLP were not subject to any duty to furnish a ladder to Searcy. If he was an independent contractor, he should have supplied his own ladder. If, however, these defendants undertook to supply a ladder to Searcy, it was their duty to supply one which was safe. Failure to do so could be found to constitute negligence. See authorities cited in *Gauld* v. *John Hancock Mut. Life Ins. Co.,* 329 Mass. 724, 726-727 (1953), and see *Poirier* v. *Plymouth,* 374 Mass. 206, 219-228 (1978), in part overruling *Afienko* v. *Harvard Club of Boston,* 365 Mass. 320, 327-330 (1974). There was evidence[11] to support the jury's answers to special questions (see note 3, *supra*) that Fagone, as an employee of DLP, acting within the scope of his employment, had supplied Searcy with a ladder, knowing the use Searcy was to make of it. This (because it could be found that the ladder lacked friction feet[12] and was only the

---

[10] The trial judge, in his instructions to the jury, told them that mere ownership by Paul of the complex was "not enough to fasten liability upon him or [to] cast upon him any duty . . . to the plaintiff . . . a business invitee." The judge also gave correct instructions to guide the jury's determination whether Fagone was acting within the scope of his authority for DLP and whether DLP was acting as agent for Paul. It is, of course, possible for a corporation to be an agent for an individual. See *Southern Pac. Transp. Co.* v. *Continental Shippers Assn.,* 642 F.2d 236, 238 (8th Cir. 1981); Restatement (Second) of Agency §§ 14M, 21 (1958).

[11] Fagone was on DLP's payroll. It reasonably could be inferred (e.g., from evidence that he let Searcy into apartments to be cleaned and helped Record inspect his work) that he was authorized to cooperate with Vortex and its employees and contractors in getting the construction work completed rapidly.

[12] The purpose of friction feet is to give a ladder greater stability. An expert, called by the defendants, conceded that an aluminum ladder lacking friction feet tends to rotate. There was no evidence that anyone warned Searcy not to use this ladder without friction feet.

bottom part of an extension ladder) presented a jury question (as to which conflicting expert evidence was offered) whether Fagone was negligent in providing the ladder. The jury reasonably also could find that this negligence was a proximate cause of Searcy's fall.

What has been said is sufficient to support the trial judge's refusal to direct a verdict for Paul and DLP on Searcy's claims against them. In the circumstances his denials of their motions for judgment n.o.v. and for a new trial also were justified.[13]

3. Searcy contends that the judge should not have directed a verdict for Home Owners, because he asserts that the evidence permitted an inference that Home Owners was the actual owner of the complex and, as landowner, had violated its duty of care toward him. On the evidence most favorable to Searcy, see *Alholm* v. *Wareham,* 371 Mass. 621, 627 (1976), there was no error in granting the directed verdict. There were in evidence (a) a quitclaim deed from Home Owners to Paul, (b) a mortgage from Paul to Home Owners, (c) a construction loan agreement between Paul and Home Owners, and (d) a note from Paul to Home Owners. These documents all purported to show that Paul was the owner of the complex, subject to Home Owners' security interest and that Home Owners retained only a mortgage interest in the property.[14] Under the terms of each such instrument exe-

---

[13] Examination of the transcript shows that, in a jury trial which lasted over six weeks, the experienced trial judge exercised great patience and dealt with counsel for all parties and the jury with appropriate consideration. Incidents mentioned in the defendants' brief as indicating unduly favorable treatment of Searcy's counsel as, for example, permitting him to expand his opening of the case more than once, to recall his expert witness, and to refer to regulations, were well within the judge's discretion, as was the judge's denial of the defendants' request for a view, again pressed after Searcy's case had been closed, at a time when only one witness remained to be called by the defendants. See *Commonwealth* v. *Curry,* 368 Mass. 195, 198 (1975); Liacos, Massachusetts Evidence 398-399 (5th ed. 1981).

Various evidence and procedural issues are discussed in par. A-1 to A-5 of the appendix to this opinion.

[14] On November 20, 1974, Home Owners conveyed the property to Paul for $1,800,000. Paul did not put up any money for the property, but did execute a nonrecorded mortgage to Home Owners for $3,100,000, a construction note for that sum, and also a construction loan agreement. The note provided for completion of construction by February 1, 1978, but

cuted by Paul, Paul was to be free of any personal liability. Paul planned to rent the units, refinance the property, and sell the complex as a whole to pay off the mortgage. The record contains no indication that Paul was to receive any compensation for serving as owner, manager, mortgagor, or construction director, except possibly as (a) companies controlled by Paul might realize a profit, or (b) the enterprise as a whole might earn enough to pay off the mortgages and other indebtedness and thus create in Paul a realizable equity.

The evidence reasonably was excluded at trial to which Searcy refers to support an inference that Home Owners remained in some degree the owner of the complex. This offered evidence included (a) a memorandum dated September 20, 1974, well before the sale in November, 1974, from Home Owners' attorney to the bank itself, describing as of that date some of the circumstances leading up to the November sale, and also (b) portions of Paul's deposition testimony to the effect that he held title to the property as Home Owners' "nominee." The deposition also showed that Home Owners gave advice to Paul and his staff with respect to selecting some personnel at the complex.

The September memorandum[15] must have been written before the November transactions had been formulated in detail. It does not justify an inference that the November sale constituted a mere paper transaction with the bank remaining the true owner. See *Green* v. *Richmond,* 369 Mass. 47, 59 (1975). See also Liacos, Massachusetts Evidence 408-409 (5th ed. 1981 & Supp. 1983, hereafter referred to as the Liacos Handbook).

---

also provided an automatic extension. Under the construction loan agreement, Home Owners was to make payments for construction costs based on Paul's business requisitions.

In March of 1977, when the construction was completed, Paul conveyed the property back to Home Owners under provisions that discharged Paul's mortgage and all his obligations. On July 1, 1977, Home Owners transferred the property by deed to Lewis Busconi, a principal of Patton Plumbing and Heating, which was a subcontractor at the complex.

[15] The September memorandum confirms that Home Owners approached Paul and offered to sell the complex to him, because of fears of violations of Federal banking regulations.

The trial judge also justifiably treated as inadmissible portions of Paul's deposition and answers to interrogatories, which may have suggested the conclusion of law that Paul held title to the complex as Home Owners' "nominee." The judge permissibly could rule, on inquiries not very precisely or clearly framed, that the statements were barred on principles fully discussed in the Liacos Handbook, at 95-103. See, e.g., *Commonwealth* v. *Brady*, 370 Mass. 630, 635 (1976). See also *Chase* v. *New York Cent. & H. R.R.*, 208 Mass. 137, 154-155 (1911); *Foley* v. *Hotel Touraine Co.*, 326 Mass. 742, 744-745 (1951). The judge reasonably could regard the term "nominee" as ambiguous and as involving a conclusion which most members of the public could not understand or use with certainty. See *Kulchinsky* v. *Segal*, 307 Mass. 571, 573 (1940), and the Liacos Handbook, at 100-101. The judge also properly excluded, upon Home Owners' motions to strike, portions of Paul's deposition testimony relating to Home Owners' advice in the selection of personnel at the complex as not responsive to the particular questions posed and because both questions and answers were not clear. See *Commonwealth* v. *Spare*, 353 Mass. 263, 265 (1967).[16]

4. The judgments are affirmed. Searcy is to have costs of appeal with respect to his claims against Paul and DLP. Searcy is not to recover as part of those costs the expenses of reproducing, for his appeal against Home Owners, any part of the record, even if that part was not reproduced in the appendix submitted by Paul and DLP. See the appendix to this opinion, par. A-8.

*So ordered.*

APPENDIX (see note 13, *supra*).

Certain less significant issues argued in the brief are discussed in this appendix, together with other matters suggested by the record.

---

[16] Some excerpts from Paul's deposition excluded by the judge are set out in par. A-7 of the appendix to this opinion. We recognize that a different result might have been appropriate if a more definite and complete foundation had been laid for that excluded evidence (including that already mentioned and somewhat similar material). As the excluded evidence was presented to the judge, however, his rulings (when made) were justified.

### Various Contentions by Paul and DLP

A-1. The judge reasonably denied a mistrial because of alleged inaccurate references by Searcy's counsel to the record (and to proposed special questions to be put to the jury) during his closing argument. At the close of that argument, the judge conferred with counsel (with the jury absent) with respect to curative instructions. The defendants' counsel did not suggest that those proposed by the judge were inappropriate, although he still urged a mistrial. The judge's interruption of Searcy's counsel's final argument to correct an apparent misreading of proposed special questions was appropriate in the circumstances. We consider that the judge's actions were well within the scope of his discretion in conducting the trial. Where counsel were in disagreement concerning the accuracy of figures concerning Searcy's damages, placed by his counsel on a blackboard during his argument, the jury were clearly told that it was their "memory that governs," not that of the judge or that of counsel for either party. The judge's instructions on earning capacity and life expectancy were appropriate and clear.

A-2. The judge explicitly told the jury that Searcy's counsel's comment in argument (that the complex was "a shoestring operation") was irrelevant and inappropriate. The jury were directed to disregard it. This was well within the judge's discretion. See *Fialkow* v. *DeVoe Motors, Inc.*, 359 Mass. 569, 571-572 (1971). It will be assumed that jurors will follow instructions of this type. *Litos* v. *Sullivan*, 322 Mass. 193, 196 (1947). See *Bessey* v. *Salemme*, 302 Mass. 188, 210-211 (1939).

A-3. During trial, regulations (relating to the prevention of accidents in construction and during window cleaning) of the Department of Labor and Industries were at first admitted in evidence. Thereafter the regulations were ruled to be inapplicable to the remaining defendants. In view of the full discussion by expert witnesses of community standards with respect to use of ladders and of this ladder in particular, the exposure of the jury to this evidence cannot have been prejudicial and in general was cumulative.

A-4. The defendants argue that they were prejudiced by the admission in evidence of a net worth statement of Paul showing substantial assets and of a letter showing an increase in insurance coverage. These were admitted only against Home Owners, while it was still a party, to show aspects of the relationship between Paul and Home Owners. Careful limiting instructions were given concerning both the net worth statement and the letter. As to the letter, the amount of the increase in insurance was deleted before the jury saw the exhibit. There was no reference to the type of insurance. When Home Owners was dismissed as a defendant after Searcy had rested his case following several weeks of trial, the judge ruled that these exhibits were out of the case.

The jury were told that Home Owners was no longer in the case and that evidence admitted only against Home Owners would not be available to them

in the jury room. This statement was emphasized in the judge's final instructions when the jury were told that they "were not to speculate" why documents which applied only to Home Owners "are no longer in the case. They are out of the case completely." We have not been referred in the briefs to any request by the defendants' counsel, following the judge's general instructions, for any more precise and specific curative instructions on these documents. At the close of supplemental instructions counsel agreed that the judge had charged sufficiently on the further matters he had agreed to discuss.

A-5. The judge denied the defendants' motion for a mistrial which was based largely upon the contention that only mistrial would sort out the material pertinent only to Home Owners. The judge could reasonably determine that it would be a waste of scarce court resources to grant a mistrial after many weeks of trial before a jury described, at the close of the case, by the judge (out of the presence of the jury) as "exceptional." He sensibly decided to spend several days with counsel (a) determining what items were not to be sent to the jury room or mentioned in the arguments of counsel, (b) ruling on evidence issues, and (c) working out the form of special questions to be put to the jury.

We think the judge exercised a sound discretion in the circumstances. See *Commonwealth* v. *Gordon*, 356 Mass. 598, 603-604 (1970); *Commonwealth* v. *Prendergast*, 385 Mass. 625, 630-631 (1982). Nothing in the jury's answers to the special questions suggests that they were improperly influenced by the documents removed from their consideration. See *Cushing* v. *Jolles*, 292 Mass. 72, 75-76 (1935). See also *Commonwealth* v. *O'Connor*, 7 Mass. App. Ct. 314, 320 (1979).

### *Various Contentions of Searcy*

A-6. The record does not support an inference that Home Owners and Paul were joint venturers in efforts to prevent loss on the complex project. No evidence showed any agreement between these parties to associate as joint venturers in the complex project. See *Cardullo* v. *Landau*, 329 Mass. 5, 8 (1952); *Shain Inv. Co.* v. *Cohen*, 15 Mass. App. Ct. 4, 7 (1982); *Payton* v. *Abbott Labs*, 512 F. Supp. 1031, 1036 (D. Mass. 1981). The only written agreements between Home Owners and Paul in the record were the deed, the mortgage, the note, and the construction loan agreement and related undertakings exonerating Paul from personal liability on those instruments. On these documents the relationship between Paul and Home Owners was merely one of a buyer and seller of land and (after the conveyance of title to Paul) one of borrower and lender. There was no evidence of a community or joint property interest in the assets of the undertaking or of significant joint control of its development. See *Air Technology Corp.* v. *General Elec. Co.*, 347 Mass. 613, 624-625 (1964). To the extent that Home Owners contributed funds to the project and Paul his skills as a real estate developer, the relationship was not more than would be usual between

a mortgagee and a mortgagor engaged in construction. Home Owners was not to share in any direct way in profits or losses from the complex. The only profit Home Owners was to realize was the fixed return on its loans. It would share losses only when foreclosure became inevitable and had taken place. Profit sharing and joint control have been considered essential to the existence of a true joint venture. *Payton* v. *Abbott Labs, supra* at 1036. See also Crane of Bromberg, Partnership § 35 (1968). Compare the views of Traynor, C.J., in *Connor* v. *Great Western Sav. & Loan Assn.,* 69 Cal. 2d 850, 862-863 (1968).

A-7. At the close of the main opinion, reference is made to excerpts from a deposition by Paul which were offered in evidence in behalf of Searcy and excluded by the judge. Some of these follow below:

*Excerpt No. 1* Q: "And that was the mortgage that you signed with a bank with an accompanying note for $3,100,000?"

[Counsel for Paul]: "Objection."

A: "Is that your testimony? That's not my testimony. My testimony is we nominally signed papers in conjunction with the bank to aid them because of the financial problem they were having with this, and whether this flipping that property into my name and/or someone's name and signing a mortgage. . . . [T]he project was flipped back to them, and we were a nominee. . . . I don't remember signing the $3,100,000 mortgage. . . . It was a rain dance to Home Owners. . . and not David Paul."

*Excerpt No. 2* Q: "On the subject . . . [of] control by the bank of subs and your memory of why the property was reconveyed back to the bank, can you clarify . . .?"

A: "One sub . . ."

[Counsel for Home Owners]: "Objection."

A: "One sub now that I recall was chosen by the bank, and that's a company called Patton Plumbing & Heating."

*Excerpt No.3* Q: "Would you advise . . . Roif on how to submit these requisitions to the bank?"

A: "No. . . . Roif had worked for, I believe, the Grossmans before. In fact, we hired . . . Roif at the suggestion of the Grossmans because they knew him. I use the word Grossmans as the people who controlled Home Owners . . . ."

*Excerpt No.4* Q: "Was there a William Casper involved in the leasing and/or selling at . . . [the complex]?"

[Counsel to Paul]: "Objection."

A: "I don't know. As I recall, the leasing or sales agent was chosen by the bank."

*Excerpt No.5* Q: "And who selected the subcontractors for the completion of the work described in that construction loan agreement?"

A: "I guess it was worked out between. . . Roif and the bank."

The foregoing excerpts from confusing testimony, discussed in long side-bar conferences between the judge and counsel, in our opinion, fall

short of permitting an inference that the November, 1974, instruments (not shown to be ambiguous) were not intended to have their ostensible effect. See and compare, e.g., *Kerwin* v. *Donaghy*, 317 Mass. 559, 565-571 (1945, in certain respects now limited by *Sullivan* v. *Burkin*, 390 Mass. 864 [1984]) and see the Liacos Handbook at 385-392.

A-8. We note that each party has printed in the appendix all, or substantially all, the transcript of six weeks of testimony. This has caused extra expenditure of time in the decision of this case. Such duplication should have been avoided. See Mass.R.A.P. 9, and 18, as amended; 378 Mass. 935, 940 (1979), and Mass.R.A.P. 8, as appearing in 388 Mass. 1106 (1983). Duplication in the appendix of parts of the record, even though more than one party may claim an appeal, should be avoided and counsel should leave out unnecessary material by agreement or, if they cannot agree, should obtain the instructions of the trial judge or another judge of the trial court. Appellate courts should not be forced to examine duplicate or unnecessary material merely because it may be less expensive for the parties to reproduce such material than to have counsel expend time in excluding it from the record.