Gants, J.
On or about September 18, 1995, the plaintiff, Lida E. Harkins (“Ms. Harkins”), endured a homeowner’s nightmare. After speaking with the defendant, Albert Strehlke (“Mr. Strehlke”), the sole owner and president of the defendant Colonial Floors, Inc. (“Colonial”), she contracted with Colonial to place a new vinyl linoleum floor in her kitchen over her old linoleum floor. However, rather than leave the old floor intact, as had been agreed, the subcontractors retained by Colonial to install the new floor removed the old flooring, then sanded a rough part of the floor left uneven by its removal. As a result of their negligent, indeed reckless, removal of the old linoleum, they released into the house asbestos fibers contained in the old flooring, thereby contaminating nearly the entire home. Just five days before her daughter’s wedding, she was forced to abandon her home and retain an environmental service company to decontaminate her home and ensure that the asbestos levels in the house were safe for occupancy. Her forced exodus from her home lasted nine weeks. When she returned, she learned that the vast majority of her worldly possessions had been discarded because of asbestos contamination. The house she returned to was once again essentially free of asbestos, but it was also essentially free of furniture, clothing, draperies, books, her son’s sports equipment, and her collections of Christmas tree ornaments from around the world and Hummel music boxes. -
On April 30, 1996, she filed suit against the two defendants, claiming that Colonial breached its contract with her, was negligent in removing the old linoleum floor, and committed an unfair and deceptive trade practice in violation of G.L.c. 93A by failing to comply with existing rules and regulations meant to protect the public’s health, safety, and welfare. See 940 CMR§3.16(3). She also claimed that Mr. Strehlke was personally responsible for all the misconduct committed, both because of his own conduct and his control over the corporation. With all parties having waived their right to a jury trial, the case was tried before this Court over three days — on December 11, 12, and 22, 1997. Based on the testimony and exhibits offered at trial, I make the following findings of fact and conclusions of law.
FINDINGS OF FACT
At some time shortly before September 2, 1995, Ms. Harkins and her friend, Steven Bowen, III, visited Colonial and spoke with Mr. Strehlke about purchasing a new linoleum floor in her kitchen. After choosing Congoleum “Future” vinyl linoleum from the floor samples, she discussed with Mr. Strehlke the different options concerning installation. He told her that they could either put the new floor over the existing floor or, if there were imperfections in the existing floor, place a thin layer of plywood over it and lay the new linoleum over the plywood. At some point during the conversation, Ms. Harkins told Mr. Strehlke that her home was 23 years old and that the floor she was replacing was the original kitchen floor. Mr. Strehlke informed her that, given the age of her old linoleum floor, it may have been made with asbestos. At no time during this conversation was there any discussion about the possibility of removing the old linoleum. Indeed, Mr. Strehlke mentioned that the reason they put in plywood over an imperfect floor rather than remove it is because of the possibility that asbestos might be found in the old linoleum.
Shortly thereafter, Mr. Strehlke went to Ms. Harkins’ residence to examine and measure her kitchen floor. He told her that they could probably go over the existing floor, without needing the plywood covering. He said the job would take one day if the linoleum could simply be placed over the existing floor, and two days if they needed to install the plywood. He then mailed her a Proposal, on Colonial stationery, stating the price for both the materials and the installation, and providing for an additional cost of $226.13 if plywood needed to be placed over the existing floor. Ms. Harkins accepted the proposal, and set up with Mr. Strehlke a date for the installation of the new floor. That date had to be postponed because of Ms. Harkins’ work commitments and was rescheduled for Monday, September 18, 1995, just five days before her daughter’s wedding that coming Saturday. Ms. Harkins did not plan to have the wedding or the wedding reception at her home, but she had intended to house the five bridesmaids, and she wanted her home to be in decent shape for their arrival.
On September 18, 1995, Robert Mattson and Ernest Ramirez, floor installing subcontractors who worked mainly but not solely for Colonial, arrived at the Harkins residence to begin work on installing the new floor. Before coming to her home, Mattson and Ramirez had gone to Colonial, picked up the flooring materials, and received a copy of the accepted Pro *129 posal. Although they were subcontractors, they never informed Ms. Harkins of their status. Indeed, when they departed her home that day, they left her a note telling her that the floor was now ready for installation and they would return in the morning to do it. The note was signed, “Colonial Floors.” Ms. Harkins, in view of all the circumstances, reasonably understood that the installers were employees of Colonial.
Beyond this set of facts, the plaintiffs memory and that of Messrs. Strehlke, Mattson and Ramirez markedly diverge. Ms. Harkins recalled that Messrs. Matt-son and Ramirez arrived at her home around 9 a.m., before she had left for work. After taking them to her kitchen, she left for some period of time and returned to find one of these two gentlemen scraping her existing linoleum floor with a knife. She was concerned about this, recalling Mr. Strehlke’s comment to her about the possibility of asbestos being contained in her existing flooring, but either Mattson or Ramirez assured her that he was just evening off the floor and would put sealant over the old linoleum before putting the new floor over it. She left for work at some time later that morning, certainly by 11 a.m. but probably earlier, having given no instructions to Mattson or Ramirez, understanding that the contract set forth in the Proposal would be carried out. She, however, was uneasy about leaving two strangers in her house to install a new floor and asked her neighbor, Linda Barry, to drop by the house and see how it was going.
Messrs. Mattson, and Ramirez, however, have a quite different memory. They recalled that they recognized early in the morning that the new linoleum could not simply be placed over the old, and that either the old linoleum had to be removed or a plywood base had to be installed. They said they spoke with Ms. Harkins about their observations and gave her the choice of removing the old linoleum or placing plywood over the old floor, informing her that the plywood option would cost her about $200 more. She chose the cheaper option. They then telephoned Mr. Strehlke, told him what they had found and what they intended to do, and he approved of their plan, telling them to do what the customer wanted. He gave them no instructions as to how they should remove the old linoleum. In all their discussions that morning — with each other, with Mr. Strehlke, and with Ms. Harkins — they never discussed the possibility of asbestos. Nor did they consider that possibility in devising their installment plans.
Mr. Strehlke corroborates Messrs. Mattson and Ramirez, but only in part. He thought their telephone call took place later in the day, but he was unsure about the time. He said he learned from them in this telephone call that the existing linoleum proved too loose to permit them to place the old floor over it. They told him they had told Ms. Harkins that they could remove the existing linoleum or put plywood over it, but that the latter option would extend the work for a day. According to Mr. Strehlke, they told him that she chose to remove the existing linoleum because she had the wedding coming up and needed the work done. Mr. Strehlke claims that they did not specifically seek his approval or even need his approval, since he viewed this as a side-deal done directly with the subcontractors.
I And, for at least four reasons, that Ms. Harkins never approved the removal of the old linoleum. First, since Mr. Strehlke had informed her of the possibility that her linoleum may contain asbestos, it is not credible that she approved removal of the old floor to save a mere $200. Based on her testimony, she is far from foolish and it is not likely that she acted so foolishly here. Second, the Proposal already addressed what should be done if the existing floor were too rough to allow the new floor to go over it; it provides both for the possibility of a plywood layer and for the additional cost of that step. There was no good reason for her seriously to consider the option of removing the existing floor, especially since the labor cost of carrying forth this option would approximate the cost of the plywood option. Third, she would not have chosen the floor removal option Ave days before her daughter’s wedding, since it was bound to be messier than overlaying the plywood. Nor is it apparent that the removal of the floor could have been done faster than the addition of the plywood. Nor do I find that the replacement of the kitchen floor was so important to Ms. Harkins that she would have chosen to remove the old floor in order to ensure that the new floor was installed in time for the wedding. She would not have wanted the job partially done at the time of the wedding, but she would have tolerated postponing the job until after the wedding if it could not reliably be finished before. Fourth, I find Ms. Harkins, corroborated in part by her friend, Mr. Bowen, more credible than Messrs. Strehlke, Mattson, and Ramirez, whose testimony I credit only in part. Messrs. Mattson and Ramirez were plainly reckless in the work they did for Ms. Harkins and owe their continued livelihood to the goodwill of Mr. Strehlke; all three have a strong incentive to justify somehow their decision to remove the existing floor. Consequently, I find that Messrs. Mattson and Ramirez, for reasons that remain unclear, decided without her approval to remove the existing flooring, passed this plan of action by Mr. Strehlke via a telephone call, and received his approval to carry it out.
I do not find credible Mr. Strehlke’s testimony that this telephone call came late in the afternoon. Not only was his memory of the time sketchy, but it would have been contrary to their usual method of operation for Messrs. Mattson and Ramirez, who were heavily dependent flnancially on the work they obtained from Colonial, to vary from a written Proposal prepared by Mr. Strehlke without his prior blessing. They would not have risked the future of their relationship with Mr. Strehlke by removing an existing floor, with all the *130 problems and complications they understood could result from so messy a job, without his knowledge and approval.
At around 10:30 a.m., Ms. Harkins’aide telephoned Ms. Harkins’ neighbor, Linda Barry, and asked on Ms. Harkins’ behalf if she would visit the residence and check on the work being done. She did so, around 11:30 a.m., but heard such foul language that she became frightened and returned home. When she called Ms. Harkins’ aide and told her what happened, she was asked to return to the residence, which she did around 12:15 p.m. When she got there, they were sanding the kitchen floor; the old linoleum had already been removed and was in plastic bags. Dust was throughout the house and there was no plastic or other barrier at the kitchen preventing the dust from going into the living room and dining room. She asked them to put up plastic to contain the dust, and they told her that the work was nearly done.
When Ms. Harkins returned home at around 5 p.m., she saw what appeared to be “smoke” throughout the first floor of the house, and found furniture on the first floor coated with a thick layer of what looked like “dust.” Her old kitchen floor was gone; pieces of it remained in her kitchen waste basket. She found the note from the workmen from Colonial Floors on her kitchen table. She telephoned Colonial Floors and said she could not believe what they had done to her home. She refused Colonial’s offer to send Service Master in the morning to clean up her home. Instead, she located Paul Rennie, an environmental contractor.
Mr. Rennie came to her home that evening. He told Ms. Harkins that no one should enter her home until the testing was completed and they could ascertain whether there was asbestos contamination. He called Sam Cohen of Envirotest, who came later that evening to take samples to test the fiber content of the air in the many rooms of the Harkins residence. The results of that test demonstrated that there was asbestos contamination throughout the first floor and basement, and in Ms. Harkins’ son’s room on the second floor, with contamination measured as asbestos fiber content greater than one percent.
Mr. Rennie and his company, Environmental Services, Inc., then prepared an Emergency Decontamination Plan, which required the approval of the Massachusetts Department of Environmental Protection (“DEP”). In a nutshell, that Plan provided that the house would be sealed, all objects that were porous in nature would be discarded, all nonporous material would be cleaned, and all refuse would be sent to an appropriate landfill. At the conclusion of the Plan, the home would be inspected by the DEP, post-abatement air tests and swipe samples would be run, and, if satisfactory, the area would be declared safe for reentry-
This Plan was carried out and DEP approval was obtained for the home again to be occupied. However, when Ms. Harkins and her son were allowed to return to their home nine weeks after the incident, few of their possessions were left. All furniture with fabric or unvarnished wood, wallpaper, carpets, clothing, mattresses, books, food, and eveiything else that was nonporous had been thrown out and sent to a landfill as asbestos material. The house was essentially a shell; they had lost most all of their worldly possessions from the contamination.
CONCLUSIONS OF LAW
The analysis of each of the four claims in the complaint — breach of contract, negligence, Chapter 93A, and the alleged personal liability of Ms. Strehlke for all the above — are sufficiently distinct to warrant separate treatment. I will discuss each in turn.
Breach of Contract
The contract between Colonial and Ms. Harkins provided for two alternatives, each "with a separate price: either place the new floor directly over the old, or place a quarter inch layer of plywood over the existing floor and lay the floor over the plywood. While the defendants contend that Ms. Harkins orally modified this contract and agreed to remove the old linoleum, I do not find, for reasons described at length above, that any such modification occurred. The defendants, however, argue a second line of defense. They claim that they are not responsible for any such breach, because the old flooring was removed by subcontractors who were not acting at Colonial’s direction. This argument fails for at least three independent reasons.
First, I have found that Messrs. Mattson and Ramirez telephoned Mr. Strehlke and received his approval, either expressly or implicitly by his apparent acquiescence in their proposed course of action, before they removed the old flooring. Therefore, the sole owner and President of Colonial approved the work performed by the subcontractors, and Colonial must be responsible for the consequent contract breach.
Second, since Messrs. Mattson and Ramirez were sent by Colonial to fulfill its contract with Ms. Harkins, did not inform Ms. Harkins that they were independent contractors, and even signed the note they had left “Colonial Floors,” Ms. Harkins reasonably believed that they were employees of Colonial. Consequently, they acted with apparent authority on behalf of Colonial, and Colonial is responsible contractually for their conduct. See, e.g. Hudson v. Massachusetts Property Insurance Underwriting Association, 386 Mass. 450, 457 (1982); Kansallis Finance Ltd. v. Fern, 421 Mass. 659, 668-69 (1996).
Third, even if Mr. Strehlke had never learned about the subcontractors’ intentions and Messrs. Mattson and Ramirez had never spoken with Ms. Harkins, Colonial would still be liable for its failure to comply with the terms of its contract with her. The obligation to fulfill the contract belonged to Colonial. Under *131 contract law, it is irrelevant whom it directed to perform that obligation, because it remains liable whether the failure was caused by an employee or an independent contractor. Restatement 2d of Contracts, §318(3) (1986).
Therefore, I find that Colonial breached its contract with Ms. Harkins by removing the old linoleum without her approval.
Negligence
There is no question (and no real dispute) that Messrs. Mattson and Ramirez were negligent in removing the old linoleum in a manner that contaminated nearly the entire Harkins home with asbestos. Colonial maintains, however, that all such negligence belongs to the subcontractors, and that, as a matter of law, Colonial is not responsible for the negligence of its subcontractors. This argument fails on at least five separate and distinct grounds.
First, as noted above, I find that Mr. Strehlke personally approved the removal of the old linoleum during the morning telephone call with Mr. Ramirez, and that approval by itself, under the circumstances of this case, was negligent conduct that substantially contributed to the asbestos contamination. Mr. Strehlke had personally inspected the linoleum at Ms. Harkins’ residence and was told its approximate age. He knew that some linoleum contained asbestos until about ten years ago, and therefore knew, or should have known, that the vinyl linoleum in Ms. Harkins’ kitchen may have contained asbestos. He testified that, whenever Colonial is removing old linoleum, he would tell the customer about the risk of asbestos and instruct her to have the old linoleum tested. Yet, in this case, when he learned that Messrs. Mattson and Ramirez were planning to lift the old linoleum, he did not make any inquiry about whether the linoleum had been tested for asbestos, speak to Ms. Harkins about the risk, or give any directions to the subcontractors about the steps they should take to ensure that the linoleum did not contain asbestos. Nor did he even make any inquiry of the subcontractors as to how they planned to remove the old linoleum to ensure that, if it contained asbestos, it did not contaminate Ms. Harkins’ home. Rather, he did absolutely nothing to guard against this foreseeable risk. Given the graviiy of that risk, the simple steps available to protect againstit, and his usual practice of taking such steps, it was negligent, indeed reckless, for Mr. Strehlke to have permitted Messrs. Mattson and Ramirez to proceed to remove the old floor without first determining whether that floorings contained asbestos. Under the doctrine of respondeat superior, Colonial is legally responsible for the negligence of its President and employee occurring within the scope of his employment. Wang Laboratories, Inc. v. Business Incentives, Inc., 398 Mass. 854, 859-60 (1986); Restatement 2d of Agency, §228 (1958).
Second, while the general rule is that the employer of an independent contractor is not liable for the harm caused by a tortious act or omission of the contractor, that general rule is riddled with exceptions. Whalen v. Shivek, 326 Mass. 142, 150 (1950) (quoting Restatement: Torts, §409). Among those exceptions is “where the nature and circumstances of the work to be performed are such that injury to others will probably result unless precautions are taken, the employer is answerable for the failure of an independent contractor to take such precautions.” Id. See also Herrick v. Springfield, 288 Mass. 212, 216-17 (1934). I find that the removal of asbestos containing material, as happened here, squarely falls within this exception. Asbestos is plainly a hazardous material, potentially damaging to one’s health if it were to find its way into a person’s respiratory system. Recognizing that asbestos removal is inherently dangerous, tire Commonwealth has established detailed procedures setting forth the precautions needed to protect the health and safety of the public when material containing asbestos is removed. See G.L.c. 149, §6A-6F; 453 CMR§§6.00 et seq. Indeed, the removal of asbestos is as dangerous and requires far more technical skill than some other activities found by the courts to fall within this inherently dangerous activity exception. See, e.g., Pannella v. Reilly, 304 Mass. 172 (1939) (spraying trees with poisonous herbicide near vegetable garden). Colonial cannot retain independent contractors, rather than employees, to remove linoleum containing asbestos, with all the dangers posed by such removal, and then evade liability for the consequences resulting from such inherently dangerous conduct.
The defendants contend that this exception does not apply because the danger of asbestos removal comes only from failing to perform the task with proper skill and care. See Whalen v. Shivek, 326 Mass. at 151, quoting Davis v. John L. Whiting & Son Co., 201 Mass. 91, 93 (1909). If this were the rule, then virtually no activity would be deemed inherently dangerous, because any activity, no matter how dangerous, can generally be done safely if proper skill and care are applied. The distinction that should be drawn is that some activities are dangerous only if negligently done, while other activities are inherently dangerous because they are likely to produce harm unless special precautions designed to protect against that harm are taken. Asbestos removal, which state law requires be done with special precautions to protect health and safety, fits into the latter category.
Third, another exception to this general rule also applies to impose liability on Colonial for the misconduct of its independent contractors. Under Massachusetts law, when a corporation carries on an activity which can be lawfully carried on only under a franchise granted by public authority and which involves a risk of harm to others, the employer is liable for the negligence of its contractor. Barry v. Keeler, 322 Mass. *132 114, 126-27 (1947) (modifying Restatement: Torts, §428). Asbestos removal may only be done in Massachusetts by a licensed contractor. Under G.L.c. 149, §6B, “no person, firm, corporation or other entity shall enter into, engage in, or work at the business of removal... of asbestos or materials containing asbestos . . . unless such person, firm, corporation or entity shall have received license therefor, issued by the Commissioner and in accordance with the provisions set forth in this chapter.” Since such work can only be done with a state license and certainly poses a risk of harm to others, Colonial may not avoid liability by delegating this task to others. Barry v. Keeler, 322 Mass. at 127.
Fourth, Colonial contracted with Ms. Harkins for the installation of her new floor and even set a price for that installation, but it failed to advise her that this work would not be done by its employees. Nor did Messrs. Mattson and Ramirez inform Ms. Harkins that they were independent contractors. She reasonably believed that they were Colonial employees retained to perform work promised by Colonial. The Restatement (Second) of Torts declares:
One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.
Restatement 2d Torts, §429. While I can locate no Massachusetts precedent speaking directly of this Restatement provision, I believe it reflects yet another Massachusetts exception to the general rule that employers are not liable for the negligence of their contractors. Indeed, the Supreme Judicial Court, speaking of Section 261 of the Restatement (Second) of Agency, recently held that an entity may be vicariously liable for fraud committed by an agent acting with apparent authority. Kansallis Finance Ltd. v. Fern, 421 Mass. at 668-69. “[A] principal who puts an agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud on a third party is subject to liability to the third party.” Id. It would be fundamentally unfair for an employer to retain independent contractors to perform specified tasks, leave customers under the reasonable, but mistaken, impression that these individuals were employees, especially when the customer permits these employees to perform this work based on part on the understanding that the employer is responsible for their performance, and then avoid liability for their negligent performance. When a customer reasonably believes that the work is being done by employees, then the employer should be liable as if they were.
Fifth, even if I were to credit the defendants’ contention that Ms. Harkins had requested Colonial to remove the old flooring, Colonial would still have been negligent. According to the testimony of Messrs. Strehlke, Mattson, and Ramirez, they never advised her about the risk of asbestos contamination from this proposed course of action. Nor did they make any effort to determine whether her old flooring contained asbestos or instruct Ms. Harkins to make such an effort on her own. Nor, since the flooring did contain asbestos, should they have participated in its removal, since neither Colonial, nor the partnership of Mattson and Ramirez, nor any of them individually had a state license to remove materials containing asbestos. Indeed, in mishandling its removal, they violated virtually every regulation that the Department of Labor and Industries has established for the protection of the health and safety of the public in the handling, removal, arid disposal of asbestos materials:
they failed to notify the Commissioner before engaging in “the asbestos associated project” (453 CMR §6.12);
they failed to use appropriate respiratory protection and protective clothing (453 CMR §6.14);
they failed to exclude other persons from the work area, remove moveable objects, isolate the work area, and cover the walls with plastic sheeting (453 CMR §6.14(a));
they failed to wet the asbestos before disposing of it (453 CMR §6.14(c)(1));
they failed to decontaminate all contaminated surfaces (453 CMR §6.14(d)); and
they failed to dispose of the old linoleum as asbestos waste (453 CMR §6.14(g)).
Chapter 93A
Under 940 CMR §3.16, Colonial has committed a violation of G.L.c. 93A, §2 if “[i]t fails to comply with existing statutes, rules, regulations, or laws, meantfor the protection of the public’s health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof. . .” As detailed above, there is no question that the removal of the old linoleum containing asbestos violated state health and safety laws and regulations. Similarly, for all the reasons detailed above, Colonial, not merely the subcontractors, is responsible for this unfair and deceptive trade practice.
Personal liability of Mr. Strehlke
The plaintiff claims that Mr. Strehlke is personally liable for the breach of contract, the negligence, and the Chapter 93A violation on two separate grounds. First, she claims that he personally engaged in negligent behavior and is responsible for that misconduct. Second, she claims that the corporate veil of Colonial should be lifted and Mr. Strehlke, its President and sole owner, should be personally responsible for all liabilities of the closely-held corporation he controls.
*133 The doctrine of respondeat superior that a corporation is liable for the negligence of its employees does not mean that a corporate employee is free from personal liability for misconduct done within the scope of his employment. Rather, a corporate employee remains personally liable for torts that he personally committed, regardless of whether or not that tort is committed within or outside the scope of his employment. Nader v. Citron, 372 Mass. 96, 102 (1977) (defendant “is not immunized as an officer and director of a corporation for the acts he is alleged to have committed personally.”). Similarly, if the President of a corporation engages in behavior violative of Chapter 93A, he remains personally liable for his commission of that unfair or deceptive trade practice. Id. at 102-03. As described in detail above, I find that Mr. Strehlke was personally negligent in approving the removal of Ms. Harkins’ linoleum without first ensuring that it was tested for asbestos. He was also personally negligent in failing properly to supervise Messrs. Mattson and Ramirez when he learned that they were about to embark on the removal of linoleum that may have contained asbestos. Indeed, since the linoleum did indeed contain asbestos, they should never have been permitted to remove the linoleum, since they were not licensed asbestos abatement contractors and knew almost nothing about the state requirements governing the isolation, removal, and disposal of asbestos containing material. Consequently, Mr. Strehlke is personally liable for his own negligence and is similarly personally liable under Chapter 93A for his failure to comply with state laws and regulations protecting the public’s health and safety.[1]
While Mr. Strehlke’s personal conduct is a sufficient basis to find him liable both for negligence and the Chapter 93A violations, I will nonetheless consider plaintiffs claim that the corporate veil should be lifted in this case. Under Massachusetts law, the corporate veil should be lifted only “in rare particular situations in order to prevent gross inequity.” My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 620 (1968). “There is present in the cases which have looked through the corporate form an element of dubious manipulation and contrivance, finagling, such that corporate identities are confused and third parties cannot be quite certain with what they are dealing.” Evans v. Multicon Construction Corp., 30 Mass.App. 728, 736 (1991). I do not find that the circumstances needed to justify lifting the corporate veil are present in this case. [2]
Mr. Strehlke is certainly the sole owner and officer of Colonial Floors, Inc., but this is not enough to justify lifting the corporate veil. The law permits one-person corporations; they are not legal nullities. It is also clear that Mr. Strehlke barely satisfied the minimum corporate formalities, and was generally late even in doing this. Indeed, the corporation was dissolved on December 31, 1990 for its failure to file annual reports, and was only revived on October 3, 1995, shortly after the asbestos contamination of Ms. Harkins’ home, “for all purposes and without limitation of time with the same powers, duties, and obligations as if the corporation had not been dissolved." Revival Certificate, Exhibit 1-M.[3] Yet, while he maintained only the narrowest distinction between himself and his corporation, I do not find anything misleading about the overall structure and operation of the corporation. Mr. Strehlke did not hold his business out as a proprietorship, nor give anyone, including Ms. Harkins, the reasonable impression that he would be personally liable for any damage to her home by the installation of the new linoleum. Nor do I find that the corporation was financially stripped to make it effectively judgment-proof; I note that the corporation was insured for certain acts of negligence, and was not insured for this claim only because of an asbestos exception in the policy. In short, while there may be few, if any, assets at Colonial to pay this judgment, there was no deception to third parties about what may have been there. In the absence of some deception or at least some confusion about the true role of this corporation, I do not find that the corporate form should be ignored and that Mr. Strehlke should be personally liable for acts of the corporation other than his own. See also Searcy v. Paul, 20 Mass.App. 134, 139 (1985) (no basis to disregard the corporate fiction unless either “flagrant disregard of corporate barriers” or fraud); Gordon Chemical Co., Inc. v. Aetna Casualty & Sur. Co., 358 Mass. 632, 638 (1971) (may disregard corporate form only when it is a sham or is used to “perpetrate deception to defeat a public policy”).
Damages
The plaintiff contends that her damages total $229,213.62, broken down into four categories:
1. Damage to her home and clean-up costs: $67,563.76
2. Loss of use of her home for nine weeks: $6,279.03
3. Personal property loss: $144,577.17
4. Miscellaneous expenses: $ 10.793.66
Total: $229,213.62
With respect to the first category, $34,135.11 derives from the bills issued to Ms. Harkins by SF Environmental Services, Inc. for the abatement of the asbestos contamination and the clean-up of her home. The remaining $33,428.65 is the estimated cost of repairing the Harkins home as determined by Kenneth Viafore, a public insurance adjuster with SMW Adjusters, Inc., who made a visual inspection of the Harkins home on October 30, 1995. I found Mr. Viafore’s testimony credible and his valuation a fair and reasonable estimate of these losses. Therefore, I include as damages the entirety of this first category.
I also include the second category in its entirety. The loss by Ms. Harkins of the use of her home for nine weeks as a result of the asbestos contamination caused by the defendants is a recoverable element of *134 damages. See Mottla, Proof of Cases in Massachusetts: Civil, Third Edition, §14.27 at 286 (1992); Urico v. Parnell Oil Co., 708 F.2d 852, 855 (1st Cir. 1982). Since there is an estimate by a local realtor, Louise Condon, that the Harkins property has a fair market rental value of $2,500 per month, and since nine weeks is approximately two months, I value the loss of use of her home at $5,000. I do not include in this valuation the cost of the temporary rental of furniture, since Ms. Harkins seeks recovery of the diminished fair market value of all property destroyed by the asbestos contamination, including her furniture, so inclusion of this amount would result in double-counting of damages.
The personal property loss estimate of $144,577.17 derives from an estimate of the replacement value of personal property destroyed by the asbestos contamination prepared by a public adjuster other than Mr. Viafore with SMW Adjusters, Inc. The adjuster who prepared this document did not testify; the estimate was admitted into evidence as a business record. Ms. Harkins testified that the procedure used by this adjuster was to go through each room after the asbestos contamination had been abated and, with Ms. Harkins’ assistance, identify all the personal property that had been contained in that room. According to Mr. Viafore, it was the usual procedure of SMW adjusters to determine the replacement value of this lost property, and include the replacement value in their estimates. The adjuster did not see any of the property whose replacement value was being determined, since all of this property was contaminated with asbestos and had been earlier removed to an appropriate landfill by S.F. Environmental Services.
The proper measure of damages for destroyed property is the fair market value of the destroyed goods. See Mottla, Proof of Cases in Massachusetts: Civil at 286; Kenney v. Rust, 17 Mass.App. 699, 704-06 (1984), rev. denied, 391 Mass. 1106 (1984). The replacement cost of the property is relevant to the calculation of the fair market value of that property but is not equivalent to it, since it does not take into account the depreciation of that property over its lifetime. Mottla at 287. Therefore, except for property that may grow in value as it ages, such as antiques and some fine wine, the fair market value of property will be less than the replacement value, perhaps substantially less if the property is aged or obsolete. Consequently, I must discount the replacement value by a rough measure of depreciation to reach the fair market value. Since no evidence was presented as to the appropriate amount of depreciation and the plaintiff bears the burden of proof on this issue, I must discount the replacement value until I find by a preponderance of the evidence that the discounted value equals or exceeds the fair market value. I estimate this depreciation discount to be 30 percent. See Mottla at 288 (“exactitude in determining depreciated value is not required”); Kenney v. Rust, 17 Mass.App. at 706.
In addition, I must further discount this category of damages because I find that the adjuster inflated the replacement cost of these items. I note that this public adjuster was retained by the plaintiff to assist her in making an insurance claim to her own insurance company, and therefore had every incentive to be generous in her estimates of the replacement cost. I also note that the plaintiff chose not to call this adjuster as a witness, and therefore offered no explanation as to the criteria used in determining replacement cost. I find that the approximate inflation of the replacement cost in this estimate is 20 percent.
When I combine the discounts for depreciation with the discount for adjuster inflation, I conclude that the fair market value of the property destroyed by the asbestos contamination is 56 percent of the amount claimed by the plaintiff, or $80,963.21.
I include as damages only $800 from the miscellaneous category of damages sought by the plaintiff — the deposit paid by Ms. Harkins to Colonial Floors for her new floor. The remainder of these miscellaneous items falls basically into two categories — personal property that was purchased to replace property destroyed by the asbestos contamination, and lodging costs during the nine weeks Ms. Harkins was out of her home. Since I have included as damages the fair market value of the property that was destroyed, it would be, at best, double-counting also to include the replacement cost of these items. Similarly, since the plaintiff seeks the fair market rental of her home over nine weeks as the measure of damages for her loss of its use, it would be double-counting also to include her actual costs of lodging.
Consequently, I find total actual damages of $154,326.97, broken down as follows:
1. Damage to her home and clean-up costs: $67,563.76
2. Loss of use of her home for nine weeks: $5,000.00
3. Personal property loss: $80,963.21
4. Miscellaneous expenses: S 800.00
Total: $154,326.97
Under G.L.c. 93A, §9(2), actual damages may be doubled or trebled if the “use or employment of the act or practice was a willful or knowing violation of said Section two or that the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said Section two.” The evidence does not support a finding that the defendants willfully and knowingly violated state health and safety laws and regulations by the removal of the old linoleum, which is the crux of the Chapter 93A violation. Indeed, I find that the defendants were not even aware that there were such laws and regulations that governed the removal of linoleum containing asbestos. Nor did they willfully or knowingly contaminate the Harkins home with asbestos; that was the result of their gross negligence, not any malice.
*135 In accordance with G.L.c. 93A, §9(4), the plaintiff is entitled to recovery of reasonable attorneys fees and costs incurred in connection with this litigation. Since the Chapter 93A claim is inextricably intertwined with the other claims, I award the full amount of reasonable attorneys fees and costs, and do not attempt to determine what share of those fees and costs derive from the Chapter 93A claim rather than the other claims. Within thirty days, the plaintiff shall submit a detailed affidavit, with itemized legal bills attached, declaring the amount of reasonable attorneys fees he contends should be awarded as a result of this decision, as well as the amount of costs due.
ORDER
For the reasons stated above, it is hereby ORDERED that judgment enter in favor of the plaintiff Lida E. Harkins in the amount of $154,326.97, plus reasonable attorneys fees and costs.

I do not find Mr. Strehlke personally liable for the breach of contract based on his participation in that contract. The contract was with Colonial, not him personally, and he does not become personally liable under that contract simply because he participated in its making and execution.

In Evans, the Appeals Court adopts from the First Circuit case of Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc., 754 F.2d 10, 14-16 (1st Cir. 1985), the “twelve factors which should be considered in deciding to penetrate the corporate form." 30 Mass.App. at 733. I do not recite them here, nor examine their application to the facts of this case, because the Evans Court made it clear that the decision whether or not to lift the corporate veil is not decided simply by counting the number of applicable factors but by determining “whether the over-all structure and operation misleads.” Id. at 736. Since it is clear that the corporate form here was not misleading, even to Ms. Harkins, there is no need to conduct a more extensive analysis.

While I am aware that the corporation was dissolved when the asbestos contamination occurred, its dissolution is of no consequence in view of its subsequent revival, which effectively continues the corporation’s existence from the date of its dissolution, as if the dissolution had never occurred. See Barker-Chadsey Co. v. W.C. Fuller Co., Inc., 16 Mass.App. 1 (1983).