BARKER-CHADSEY COMPANY *vs.* W. C. FULLER CO., INC.
& others.[1]

Bristol. March 11, 1983. — May 13, 1983.

Present: GRANT, KAPLAN, & DREBEN, JJ.

*Corporation*, Dissolution, Revival, Liability of officers.

Where the parties to a transaction involving the extension of credit to a
corporation and execution of a note for the corporation by its treasurer
did not know that the corporation had been dissolved six years earlier
for failure to file annual reports or to pay franchise taxes and the par-
ties intended that the corporation, rather than its officers individually,
would be bound on the note, this court determined that the officers
would not be individually liable on the note if they secured a revival of
the corporation sufficient to validate the transaction in question
within a time to be prescribed by the Superior Court. [4-9]

CIVIL ACTION commenced in the Superior Court on
February 14, 1977.

The case was heard by *Jacobs*, J., on a master's report.

*Robert S. Mangiaratti* for the plaintiff.

*Paul M. Rockett* for Claire Quintin & another.

KAPLAN, J. The defendant W.C. Fuller Co., Inc.
(Fuller), a Massachusetts corporation engaged in the retail

---

[1] Claire Quintin and Girard Quintin.

hardware business in the town of Mansfield, had for some years purchased merchandise at wholesale from the plaintiff Barker-Chadsey Company (Barker), a Rhode Island corporation. Claire Quintin and Girard Quintin (added as defendants, as will appear) were the sole officers, directors, and shareholders of Fuller and conducted the business. On May 9, 1975, Fuller owed Barker $37,721 ($25,817 principal, $11,904 interest) for goods bought. On that date Fuller, by Claire Quintin, as treasurer, executed a promissory note in that amount in favor of Barker, and at the same time executed a security agreement covering the Fuller inventory. In February, 1977, the note being in default, Barker brought an action against Fuller in the Superior Court to foreclose on the security and recover on the note. The inventory was yielded up voluntarily and at that point Fuller's active business ceased.[2] Barker realized $9,639 by private sale.

Barker learned, perhaps after the sale, that, because of Fuller's failure to file annual reports or to pay franchise taxes, it had been dissolved on September 11, 1969, by judgment under G. L. c. 156B, § 101 (as then in effect), upon the application of the State Secretary. Accordingly Barker amended its complaint in May, 1979, to add a claim against Claire Quintin, personally, on the note, and an alternative claim against Claire Quintin and her husband Girard Quintin, both personally, for goods sold. The Quintins answered with denials and the case was referred to a master for report, "facts final."

In his report, the master, after hearing, found certain of the main facts as recounted above, and other facts as follows. There was an indebtedness of Fuller to Barker of only $798 on September 11, 1969. When Claire Quintin executed the note as treasurer on May 9, 1975,[3] she did not

---

[2] See note 3, infra.

[3] The master observed that Barker had requested the note and security because Girard Quintin was in poor health, and Barker was concerned about Fuller's ability to continue in business.

know that Fuller had been dissolved; she believed the corporation was ongoing, and she did not intend to make the note as an individual. She stated her belief at the hearing before the master that the annual "corporate certificate of condition" (apparently referring to the annual report required by G. L. c. 156B, § 109) had been filed but she did not know for which years. The master found that the last corporate tax return filed for Fuller was for the fiscal year ended on June 30, 1975, but it was not filed until some time in 1978.[4] Fuller has not been "revived" under G. L. c. 156B, § 108 (set out in note 9, *infra*).

As to Barker, the master found that when it took the note it did not know of the dissolution of Fuller in 1969. In extending credit to Fuller, and later in taking the note, Barker was relying on Fuller and not on the Quintins individually; for security it was looking to the corporate assets of Fuller and not to the individuals.

The master concluded that the Quintins were not liable, but that Fuller was liable for the balance of the note plus interest, costs, and expenses of collection including counsel fees (as provided in the note).

On cross applications to adopt and to modify the master's report, the judge adopted its conclusion in substance that the Quintins were not liable personally, but he did charge them as trustees in Barker's favor to the extent of any property they might hold or control and to which Fuller would be entitled if revived.[5] From the judgment, Barker appeals.

Barker, as appellant, looks into the well of history to find a theory for holding the Quintins personally. Barker argues that when Claire Quintin signed the note as treasurer of Fuller, there was no such corporation; hence she had no principal which she could represent as agent, and it followed that she must be personally responsible. The claim that Girard Quintin is liable finds explanation along the same line.

---

[4] The master noted that a fire in 1974 caused by lightning destroyed all the corporate records of Fuller.

[5] No judgment was entered against Fuller, the dissolved corporation.

All this is reminiscent of *Fay* v. *Noble,* 7 Cush. 188 (1851). There it was assumed that the organizers (shareholders) of the West Boston Iron Company had failed to comply with the requisites of law in attempting to form that corporation, and one of the questions put was whether they might be considered as partners regarding a transaction that had been carried out by the chief shareholder acting as "general agent." The court by Justice Bigelow thought that, in the absence of a fraudulent intent, it would be unfair to fasten on the organizers a responsibility as partners not contemplated or assented to by them. Instead the court was prepared to hold that the individual who had been active in the particular business was the only one responsible — this on theory that he was an agent without a principal and so must himself be regarded as the principal.[6]

The approach of the *Fay* court was formal. On a functional analysis it might be seen that, if it was unfair to cast unanticipated liabilities on the organizers who were not active in the transaction, then it would be also unfair to charge with like liability an agent who was acting for them. There would be reason to inquire whether the party who had dealt with the agent had done so on the understanding, shared with the agent, that liability was corporate without recourse against any of the organizers. If that was the mutual understanding, without misrepresentation or any other such reprehensible element, the party could not complain when in the end he fared no worse than he would have done, had the corporation been properly formed. The result thus indicated, however, would be impeached if there was some provision of law evincing a policy that required firm compliance with those conditions for lawful incorporation which had been neglected or flouted. That should be

---

[6] A later phase of the same case, better revealing the facts, appears at 12 Cush. 1 (1853). The actual question was whether a pledge of metal given to the plaintiff to secure a loan to the corporation (via the agent) prevailed over a subsequent mortgage.

most important. The approach to the problem just outlined would, we think, be natural today.[7]

The present case involves not a fractured corporation, but one that has been dissolved. The approach should be similar. It counts in favor of the Quintins that there was originally, and through the episode of the note, a shared understanding of the parties that liability was corporate, not individual, and there is no indication of any manipulative purpose on either side. To find whether there is a countervailing policy, we go to the statutes dealing with the dissolution and revival of corporations.

Upon dissolution of a corporation — as in Fuller's case, for failure to file reports or to pay taxes — "some dormant germ of life"[8] is continued for three years for the purpose of permitting the windup of the affairs of the corporation and its final liquidation, "but" (so says G. L. c. 156B, § 102, as appearing in St. 1965, c. 685, § 44) "not for the purpose of continuing the business for which it was established," save, perhaps, as far as may be needed for orderly rather than precipitous liquidation. For one reason or other, however, active business in fact may have been carried on after a judgment of dissolution: in the present case, the corporate officer was simply ignorant of the fact of dissolution. In such situations the officers (among other interested parties) may apply to the State Secretary for "revival" of the corporation.

The revival statute says that reinstatement may be allowed on terms: it may be on the condition, and no doubt this is the usual one, that back taxes be paid. The effect of revival is stated in § 108 to be that "all acts and proceedings

---

[7] See the discussion to this effect in Lattin, Corporations § 60, at 196-197 (2d ed. 1971). There is perhaps some anticipation of the approach in Warren, Collateral Attack on Incorporation. A. De Facto Corporations, 20 Harv. L. Rev. 456, 475-476 (1907).

[8] The phrase is Chief Justice Qua's in *Russell Box Co.* v. *Commissioner of Corps. & Taxn.*, 325 Mass. 536, 540 (1950). Of course no practical inferences are to be drawn from a metaphorical statement that a corporation is half alive or dead.

of its [corporation's] officers, directors and stockholders, acting or purporting to act as such, which would have been legal and valid but for such dissolution, shall, except as aforesaid [apparently referring to revival on terms], stand ratified and confirmed."[9]  See *Massachusetts Lubricant Corp.* v. *Socony-Vacuum Oil Co.,* 305 Mass. 269 (1940). Application for revival may be made without limit of time.[10]

Revival under § 108 has the usual effect of confirming, as corporate acts, the acts of corporate officers in the interim before revival, and correspondingly, of relieving the officers of personal liability.[11]  Just so, in *Frederic G. Krapf & Son*

---

[9] The full text of § 108 is: "If the state secretary finds that the existence of a corporation has terminated in any manner and that such corporation ought to be revived for all purposes or for any specified purpose or purposes with or without limitation of time, he may, upon application by an interested party, file in his office a certificate in such form as he may prescribe reviving such corporation.  The state secretary may subject the revival of such corporation to such terms and conditions, including the payment of reasonable fees, as in his judgment the public interest may require.  Upon the filing of a certificate reviving a corporation for all purposes, said corporation shall stand revived with the same powers, duties and obligations as if it had not been dissolved, except as otherwise provided in said certificate; and all acts and proceedings of its officers, directors and stockholders, acting or purporting to act as such, which would have been legal and valid but for such dissolution, shall, except as aforesaid, stand ratified and confirmed.  If such a corporation is revived as aforesaid for a limited time or for any specified purpose or purposes, it shall stand revived for such time or for the accomplishment of such purpose or purposes in accordance with the terms of the state secretary's certificate. For cause shown to his satisfaction, the state secretary may, by certificate filed as aforesaid, extend the time for which a corporation revived for a limited time shall stand revived.  A certificate filed by the state secretary pursuant to this section shall constitute an amendment of the articles of organization of the corporation, effective when filed."  G. L. c. 156B, § 108, as amended through St. 1969, c. 392, § 24.

The procedure in applying for revival is set out in 950 Code Mass. Regs. § 104.18 (1979).

[10] Formerly the period was five years.  The change was made by St. 1969, c. 392, § 24.

[11] We say "usual effect" because we conceive that validation would not be warranted if, for example, the corporate officer had made it appear that he or she was contracting as an individual.

v. *Gorson*, 243 A.2d 713 (Del. 1968), the defendant Gorson, president of a "one-man corporation," had inadvertently failed to have the annual reports filed and franchise taxes paid, and unknown to him the corporate charter was forfeited. As president, Gorson thereafter entered into a contract with the plaintiff, both parties intending the obligation to be that of the corporation. Suit was brought against Gorson personally. The Supreme Court of Delaware held, applying a statute similar to our § 108,[12] that Gorson was relieved of personal liability by reason of the revival of the corporation. The policy of statutes of the Massachusetts and Delaware type is highlighted and emphasized by the existence of some statutes elsewhere which take a different tack and declare, in effect, that corporate revival shall not affect the personal liability of officers for acts following dissolution. See *Moore* v. *Occupational Safety & Health Review Commn.*, 591 F.2d 991, 995 (4th Cir. 1979) (Virginia statutes); *Futch* v. *Southern Stores, Inc.*, 380 So. 2d 444 (Fla. Dist. Ct. App. 1979); *Mobil Oil Corp.* v. *Thoss*, 385 So. 2d 726 (Fla. Dist. Ct. App. 1980); *Panax of Florida, Inc.* v. *Publishers Serv. Corp.*, 472 F. Supp. 444 (S.D. Fla. 1979).[13]

It can be argued with reason that, to take the benefit of the lenient approach of § 108, the Quintins should have gone through the revival procedure at an earlier stage, that the limit of tolerance for the Quintins was reached not later

---

[12] The Delaware statute, Del. Code Ann. tit. 8, § 312(e) (1975), is like ours but adds explicitly (what we take to be the implication of our § 108) that the contracts, etc., shall be the exclusive liability of the reinstated corporation.

[13] Notwithstanding the tenor of the Florida statutes, as described, the court in *Futch* denied personal liability after revival where the officer in the post-dissolution transaction had not induced the creditor to rely on her individual assets (380 So.2d at 446), and the *Mobil Oil* court would relieve an officer who was inactive in the transaction. Such attitudes might bring Florida near Delaware and Massachusetts (see note 11, *supra*).

(The changing Florida statutory pattern is discerned by reading consecutively *Spector* v. *Hart*, 139 So.2d 923, 927 [Fla. Dist. Ct. App. 1962], and the three Florida cases cited in text.)

than a reasonable time after they got notice through Barker's amended complaint that Fuller had been dissolved. Yet § 108 fixes no precise time for seeking reinstatement of a dissolved corporation. On the one side, we have to consider that the allowance of a personal recovery against the Quintins would amount to a windfall for Barker beyond its proper expectations in entering upon contractual relations with Fuller. On the other side, there has been delinquency in corporate accountability to the Commonwealth. A sound resolution, we think, is to make relief of the Quintins from personal liability contingent on their applying for and securing, within a time to be prescribed by the Superior Court, a revival of Fuller sufficient to validate the transactions here involved as corporate acts; meanwhile the Quintins should be charged as trustees in the sense noted by the trial judge.

The Delaware case is authority for giving effect to a revival obtained after action is brought against the corporate officer; in fact the trial of the action was suspended to permit the necessary steps to be taken. *Frederic G. Krapf & Son,* 243 A.2d at 714. But cf. *PEPI, Inc.* v. *Helcar Corp.,* 458 F.2d 1062, 1064 (3d Cir. 1972) (possible intimation that revival must have occurred not later than the trial of the action).[14] We have found no case where securing revival figured explicitly as a condition of relief granted on appeal,[15] but we see no objection to this in principle. The measure of the present case is that there is no significant statutory policy which opposes the carrying out of the mutual understanding of the parties; on the contrary, § 108 is supportive of the fulfilment of that understanding. It is fitting, however, that a decision for the individual defend-

---

[14] In *PEPI* the New Jersey statutes did not state what was the effect of timely revival, but the court assumed that it would validate interim acts. See also *J.B. Wolfe, Inc.* v. *Salkind,* 3 N.J. 312, 317-320 (1949).

[15] But see *Peacock Hill Assn.* v. *Peacock Lagoon Constr. Co.,* 8 Cal. 3d 369, 373-374 (1972), where a dissolved defendant corporation was allowed to carry on an appeal having apparently secured revival pending the appeal.

ants should be the occasion for making good any corporate dues owed to the Commonwealth.[16]

The judgment is vacated and the case is remanded to the Superior Court for further proceedings not inconsistent herewith.

*So ordered.*

---

[16] The Delaware court in *Frederic G. Krapf & Son* puts the matter perhaps more strongly: "[F]ailure to pay franchise taxes is an issue solely between the corporation and the State since the franchise tax statutes are for revenue-raising purposes alone. This being so, if the creditor dealt in good faith with the corporation as a corporation, and if no fraud or bad faith on the part of the corporate officers is involved, the creditor's remedy is against the corporation." 243 A.2d at 715.