van Gestel, J.
This matter is before the Court after a jury-waived trial on the merits. The relief sought in the plaintiffs’ second amended complaint is set out in four counts: Count I seeks a dissolution of a limited partnership and an accounting: Count II charges *252 breaches of fiduciary duties regarding certain property management fees; Count III charges breaches of fiduciary duties regarding various payments made by the general partner; and Count IV seeks relief pursuant to G.L.c. 93A.[1] What follows are the Court's findings of fact, rulings of law and an order for judgment.

FINDINGS OF FACT

As of June 20, 1994, a Massachusetts limited partnership named 354-360 Washington Street Limited Partnership (the “Partnership”) was established. The defendant SNK Corporation (“SNK”) is the general partner. The defendant Amit Kanodia (“Kanodia”) is the president of SNK and its sole stockholder. SNK holds an 80% interest in the Partnership. Kanodia also claims an interest in a single share in the Partnership as a limited partner. This claim is challenged by the plaintiffs. The plaintiffs Peter Lockey (“Lockey”), Matthew Boudreau (“Boudreau”), Marcia Lloyd (“Lloyd”), Kenneth Rhodes (“Rhodes”) and Louis Yany (“Yany”) are all among the limited partners with shares varying from 1/2 to 11/2 units of the Partnership. There are other limited partners who are not parties to this action.
The purpose of the Partnership is to acquire, hold, own, maintain, improve, finance, operate, manage, lease, refinance, and sell or otherwise deal with or dispose of the real property described on Schedule B to the Partnership agreement. Unfortunately, neither the copy of the agreement attached to the original complaint, the first amended complaint, the second amended complaint, nor included as part of Exhibit 21, nor admitted as Exhibit 37 contains a “Schedule B.” Nevertheless, from the other evidence presented, the Court makes these findings on the assumption that there is a Schedule B and that it describes the real property located at 354-360 Washington Street, Dedham, Massachusetts (the “Property”), as being the subject of the agreement.
SNK, as general partner, is given the “full and exclusive discretion in the management of the Partnership.” In that regard, SNK is given the authority “to make all decisions affecting the Partnership’s affairs and business and full and exclusive discretion to take any and all actions the General Partner deems appropriate with respect thereto.”
By Section 5.2(c) of the Partnership agreement, SNK is authorized and given the right, in its sole discretion, “to expand, rehabilitate, develop, maintain, operate, manage and improve all or any part of any property owned by the Partnership, real or personal.”
By Section 5.2(d) of the Partnership agreement, SNK is authorized and given the right, in its sole discretion, to, among other things, “refinance or replace any borrowing of the Partnership or any other borrowing secured by any of its assets ...”
By Section 5.2(g) of the Partnership agreement, SNK is authorized and given the right, in its sole discretion, to, among other things, “enter into any kind of activity and to perform and carry out contracts of any kind which the General Partner deems appropriate with respect to or incidental to the accomplishment of the purposes of the Partnership, as long as said activities and contracts may be lawfully carried on or performed by a partnership under the laws of the Commonwealth of Massachusetts, and to modify or terminate contracts and agreements with third parties in connection with the Partnership business.”
By Section 5.2(k) of the Partnership agreement, SNK is authorized and given the right, in its sole discretion, to “employ such agents, employees, managers, accountants, attorneys, consultants and other persons necessary or appropriate to carry out the business and affairs of the Partnership' and to pay such fees, expenses, salaries, wage and other compensation to such persons as it shall in its sole discretion determine."
By Section 5.2(1) of the Partnership agreement., SNK is authorized and given the right, in its sole discretion, to “pay, extend, renew, modify, adjust, submit to arbitration, prosecute, defend or compromise, on such terms as it may determine and upon such evidence as it may deem sufficient, any obligation, suit, liability, cause of action or claim, including taxes, either in favor of or against the Partnership.”
By Section 5.3 of the Partnership Agreement, the limited partners have, among other things, “the right to approve . . . any borrowing by the Partnership, except by means of a Priority Loan . . .” A “Priority Loan” is an advancement of funds to the Partnership pursuant to Sections 3.2 and 3.3 of the agreement. Those sections relate to funds from partners on a capital call. Section 5.3 states as follows regarding the notice and approval process:
The General Partner shall deliver notice of any proposed Major Decision [including a borrowing other than a Priority Loan] to the [limited partners]. If the [limited partners do] not deliver to the General Partner written objection to such Major Decision within ten (10) days of receipt of such notice from the General Partner, such proposed Major Decision shall be deemed approved by the [limited partners].
Section 5.5 provides that SNK, as the general partner, “shall not be entitled to any compensation for acting” in that role, but it is entitled “to be reimbursed from Partnership funds for all out-of-pocket expenditures made ... in the conduct of the Partnership business and the fulfillment of the General Partner’s obligations ...”
Section 5.6 authorizes SNK to employ, contract and deal with affiliates and pay them “such remuneration as the General Partner, in its sole discretion, deems appropriate.”
By Section 7.1 of the Partnership agreement, SNK is required to maintain “full and accurate books and records at the principal place of business of the Part *253 nership.” Those records are to “be available for inspection and examination by each Partner for any purpose reasonably related to its interest in the Partnership
Section 8.1(d) of the Partnership agreement provides that the Partnership “shall be dissolved upon .. . [t]he Withdrawal of the General Partner unless, within ninety (90) days after the occurrence of such event, all remaining Partners agree in writing to continue the business of the Partnership and to the appointment” of one or more additional general partners. The word “Withdrawal” is defined in Article 2 of the Partnership agreement, with respect to a general partner, as “the ceasing to be a General Partner for any reason whatsoever, whether voluntary or involuntary, including but not limited to, permitted or prohibited withdrawal under Article 8 hereof or withdrawal on account of death, insanity, incapacity, dissolution or the occurrence of an Event of Bankruptcy.”
Upon dissolution of the Partnership, Sections 8.2 and 8.3 of the agreement mandate the cessation of business, the winding up of the Partnership and the appointment of a “Liquidator.” It is further provided in Section 8.3 that the “Liquidator shall be the General Partner.”
On August 31, 1998, SNK was dissolved by the Secretary of the Commonwealth, presumably for failure to file annual returns or some other reports. An application for revival pursuant to G.L.c. 156B, Sec. 108 was filed, and on November 23, 1999, SNK was “revived for all purposes and without limitation of time with the same powers [sic] duties and obligations as if the corporation had not been dissolved.”
Section 9.1 of the Partnership agreement provides broad exculpation and indemnification between and among the partners for any acts “not attributable to its own gross negligence, willful misconduct or fraud.”
Shortly before the establishment of the Partnership, Kanodia, who was in the business of investing in and managing real property, learned of the availability of the property at 354-360 Washington Street in Dedham. He bid on it at a foreclosure auction and acquired it for about $560,000, after paying the auction purchase price of $360,000 plus outstanding taxes and liens.
It was on the advice of a one-time friend and business colleague, Stephen A. Neumeier (“Neumeier”), that Kanodia established the Partnership with his corporation, SNK, as the general partner. Neumeier, however, was the person who located and brought in most of the limited partners.
The Property was acquired sight unseen, but with the knowledge that it was “distressed” real estate. The building had undergone a form of metamorphosis from a gasoline station, to a bowling alley, to commercial office space. At the time of its acquisition by the Partnership in 1994, the sole tenant of the Property was the Norfolk County District Attorneys Office. The District Attorney was a tenant at will, with no lease.
In 1994, the Property was in very poor condition and had an exceptional number of physical problems. The District Attorney had strained the building’s occupancy beyond any limit that a commercial tenant would accept. Property that might moderately well house 40 or so office-type employees had been expanded to squeeze in over 100. The amenities such as carpeting and the like were worn beyond salvation. The interior and exterior needed painting. The electrical system required extensive updating. The main supporting beam in the basement was rusting away, and the building sagged as a result. Residential-type windows needed to be replaced by commercial grade stock. The third floor was unfinished and needed to be fitted out. The HVAC system was constantly failing and needed total overhaul. There were significant plumbing problems. In essence, almost everything with the building needed to be repaired, refurbished or upgraded. Local authorities — including the Dedham Fire Department, Police Department and the Building Inspector — were all demanding changes. And the DCPO, on behalf of the District Attorney, was regularly demanding reports and modifications. In short, the Property was essentially unusable without major, and expensive, remodeling.
The District Attorney’s Office vacated the building on April 30, 2000, and the building remained vacant until mid-September of that year. It currently is partially tenanted, and a lease is being negotiated, although the' basement and first floor are still empty, and the third floor is under construction.
When the Property was first acquired in 1994, Kanodia suggested to Metro West Bank in a document entitled “Projected Annual Property Operating Data” that property management expenses would be at 5%."
Later, in 2000, Kanodia submitted to another bank a “Proforma of Income & Expense” that included a “Management Fee 5% of gross rent.” This pro-forma, however, was noted to be “for discussion purposes only” and assumed the existence of a tenant with a lease producing $336,000 per year. There was no such tenant or lease at the time.
In actuality, the management fees paid by SNK to Lincoln Realty Group, another entity controlled by Kanodia, for all years from 1995 through 2000 ranged from $17,400 to $23,649. This averaged out to about $19,950. Assuming rental income of $336,000, 5% would amount to $16,800, and 6% would amount to $20,160. All parties agreed that a management fee of 5% to 6% of rental income for an average building is a common rate.
Not long into the life of the Partnership, there was a significant falling out between Kanodia and Neumeier. This erupted into a complaint dated June 4, 1996, being filed in the Suffolk Superior Court, captioned *254 Stephen A. Neumeier v. SNK Corporation and Amit K. Kanodia, Civil Action No. 96-3307. Neumeier charged SNK and Kanodia: with breach of contract, claiming rights to a unit in the Partnership or money damages of $32,000; with a violation of G.L.c. 93A for failing to provide him with an IRS Form K-l reflecting ownership in one unit of the Partnership; with defamation for endorsing a check “reimbursement of stolen funds”; and with breach of contract for real property management services in the amount of $6,525. This complaint was responded to by an answer and counterclaim. In the counterclaim SNK and Kanodia accused Neumeier of misappropriating funds of the Partnership while Kanodia was away in India. The counterclaim had counts for violations of G.L.c. 93A, for interference with advantageous contractual relations, for illegal dis-possession and for rent due.
Neumeier v. SNK Corporation, et al., was heavily litigated and then settled before trial for a cash payment to Neumeier of $47,000. One of the plaintiffs here, Lockey, actively supported and assisted Neumeier in matters relating to this litigation. The attorneys fees to defend the case, charged to the Partnership, exceeded $100,000. Trial counsel for SNK and Kanodia opined that the amounts charged were reasonable, and no contrary evidence was presented.
Lockey holds a master’s degree in taxation and, among other things, is a certified public accountant in Massachusetts and Rhode Island. In his CPA capacity, Lockey was the preparer of the Partnership’s Form 1065 U.S. Partnership Return of Income for calendar years 1994 and 1995.
Starting with a letter dated September 2, 1997, and while the Neumeier/SNK litigation was in progress, Lockey, purportedly on behalf of himself and some of the other limited partners, began writing letters and communicating with Kanodia, seeking information about various aspects of the books and financial management of the Partnership. In the beginning, the inquiries focused on the 1996 Partnership tax return, the 1997 year-to-date balance sheet and income statement, and the checkbook for same period. As time went on, and as information was not forthcoming from Kanodia, Lockey’s letters intensified in their detail and demands for information.
After a September 1, 1998 meeting with Mr. Maarj Qazi at the law offices of Peabody & Arnold at which certain documents were provided, Lockey sent Kanodia a confirmatory letter dated September 10, 1998. In the letter Lockey described what he said was provided by Mr. Qazi. On the copy of that letter put into evidence by Lockey, there are notations in Lockey’s handwriting indicating either his agreement or in some instances his desire for more information regarding particular items. Also, at an October 1998 meeting, Lockey stated that most of the information he received was in the form he wanted, but that he did not get all he wanted.
On June 1, 1999, counsel for Kanodia sent a letter to Lockey that has as attachments three estimates regarding work proposed to be performed on the Property. One estimate, from Empire Engineering, proposed $233,000 for work on water source heat pumps, third floor area and rehabilitation of the existing 1st and 2nd floors and basement areas. Another estimate, from Landmark Construction Corporation, proposed $676,450 for work on the basement, the first floor, the second floor, the third floor, painting, French drains, flower bed repairs and window repair. The third estimate, from Atlantic Elevator North, proposed $185,000 for an elevator line to serve the third floor.
The Partnership did not engage any of the three parties making the foregoing estimates. Rather, Kanodia shopped around and was able to enter into an agreement with Majestic Construction, Inc. for about $306,000 to do some, but by no means all, of the work previosuly estimated by Empire, Landmark and Atlantic Elevator.
The search for information kept on after October of 1998. Kanodia from time to time would produce more information, and Lockey would request still more detail. This all culminated in a meeting at the end of September 1999. Lockey, Yany, Kanodia, Kanodia’s attorney and Douglas MacLean, Senior Vice President of First Massachusetts Bank, were all present. There occurred a discussion of finances and expenses of the Partnership going back three years. At the end of the meeting Lockey, although generally content, stated that he still wanted information regarding the Partnership’s legal bills, the magnitude of the management fees and back-up for certain management expenditures.
Also, at the September 1999 meeting there was a discussion about the need to raise funds to do work necessary to refurbish the Property. Two methods of raising funds were posited: a capital call on the partners and refinancing with a lender. Nobody seemed receptive to the capital call, and nobody voiced any objection to a refinancing.
Without further communication with the limited partners, Kanodia and SNK proceeded to obtain refinancing with Middlesex Bank. The refinancing closed in February of 2000. The bank committed to lend $850,000 at an interest rate of 8.75% for five years, followed by an adjustable interest rate of 200 basis points over five-year Treasury bills. To the date of trial, the Partnership has only drawn down $477,000. Kanodia personally guaranteed this borrowing.
The original financing in 1994 was in the amount of $535,000 at an interest rate of 8.75% until July 1999, at which time it went to an adjustable rate calculated at 300 basis points over the Boston Federal Home Loan Bank five-year fixed rate.

*255
RULINGS OF LAW

The Court begins its rulings of law with a vexing, but unanswered issue relating to the significance of the dissolution by the Secretary of State of SNK Corporation on August 31, 1998, and its revival on November 23, 1999. There are two aspects that must be determined, and there appears to be no law on point other than the statutes implicated.
General Laws, Chapter 156B, Sec. 100 authorizes the Secretary of State to dissolve a corporation for failure to comply with the provisions of law requiring the filing of reports or for other reasons. No evidence as to the reason for the dissolution of SNK was presented. In its absence, the Court infers that the dissolution here was for the most benign of the reasons provided in Sec. 100: the failure to file reports.[2] Such a dissolution is subject, among others, to the provisions of Sec. 108 of c. 156B.
General Laws, Chapter 156B, Sec. 108 permits the Secretary of State to revive a dissolved corporation upon application therefor. Such a revival occurred here on November 23, 1999. “Upon the filing of a certificate reviving a corporation for all purposes, said corporation shall stand revived with the same powers, duties and obligations as if it had not been dissolved, except as otherwise provided in said certificate; and all acts and proceedings of its officers, directors and stockholders, acting or purporting to act as such, which would have been legal and valid but for such dissolution, shall, except as aforesaid, stand ratified and confirmed.” Id. There was no limitation in the certifícate of revival for SNK.
"[W]here, as here a revival certificate is filed . . . the right of the revived corporation ... is retroactively restored . . .” Devlin Const. Corp. v. Driftway South Const. Corp., 14 Mass.App.Ct. 954, 955 (1982). The Massachusetts revival statute is said to provide a lenient approach, re-establishing the status quo ante for dissolutions that come about from inadvertent failures to file annual reports. See, e.g., Barker-Chadsey Co. v. W.C. Fuller Co., 16 Mass.App.Ct. 1, 6-8 (1983). Thus, there is no question, and this Court rules, that SNK was duly revived, and all actions of Kanodia, its president and sole stockholder, during its period of dissolution stand ratified and confirmed.
The issue here, however, does not end with the revival of SNK. The Court still must examine the Partnership agreement provisions regarding dissolution.[3] The “dissolution” here, of course, is of the Partnership itself, not of SNK the corporation. Section 8.1(d) of the agreement states that the Partnership “shall be dissolved" upon . . . [t]he Withdrawal of the General Partner ..." (Emphasis added.) “Withdrawal” is a defined term meaning, with respect to the general partner, “the ceasing to be a General partner for any reason whatsoever, whether voluntary or involuntary, including . . . dissolution." (Emphasis added.) The emphasized word “dissolution” used in the definition of "Withdrawal” does relate to the dissolution of SNK.
The question to be resolved is whether the statutorily permitted dissolution, subject to revival with retroactive ratification and confirmation of all powers, of SNK as a corporation, followed by its revival, nevertheless results in a dissolution of the Partnership. Based on its consideration of the situation and the presumed intent of the partners as expressed in their agreement, this Court rules that there was no dissolution of the Partnership under the circumstances presented.
Although the Partnership agreement’s definition of “Withdrawal” includes “involuntary” dissolution of the general partner, that language ought not be read to include the kind of dissolution that occurred here when there was a proper revival.[4] Such an inadvertent withdrawal was certainly not on the minds of the partners here, at least based upon any evidence presented at trial. Throughout the period from August 1998 to November 1999, Lockey’s many letters seeking information were addressed to “SNK Corporation/General Partner.” See, e.g., trial Exhibits 18, 23, 26, 27 and 29. There was no evidence presented that any one of the partners was even aware of the Secretary of State’s dissolution of SNK until this suit was filed, or that the dissolution affected the operation of the Partnership in anyway. The limited partners were looking for information from the general partner about the ongoing operation of the Partnership, not its liquidation.
Further, the Partnership agreement itself mandates in Section 8.3 that upon the Partnership’s dissolution, a Liquidator is to be appointed, and that “Liquidator shall be the General Partner.” Thus, under some circumstances at least, the general partner is expected to act in furtherance of the Partnership’s dissolution, presumably even when that dissolution is caused by its own withdrawal because of its own dissolution.
Lastly, and more significantly, the Court is aware of the fact that any forced dissolution of a limited partnership may produce serious and unintended adverse consequences for the various partners. See, e.g., Procedures and Remedies in Limited Partners' Suits for Breach of the General Partner's Fiduciary Duty, 90 Harv.L.Rev. 763, 779-82 (1976-77). Certainly the agreement here should not be read in a manner to make such consequences a possibility resulting from an inadvertent dissolution, later revived, of the corporate general partner, unless no other reading is permitted by the document’s language.
Thus, the Court rules that in the factual situation presented, particularly SNK’s revival and the retroactive ratification of Kanodia’s acts as its president, the Partnership itself was not dissolved or, if it was, it too was reconstituted.
The Court next turns to the issues raised by the plaintiffs relating to management fees, legal fees, un *256 substantiated expenses, refinancing, and the claim that Kanodia did not pay for his limited partner’s single unit in the Partnership.
With regard to the management fee issue, the legal fees and the unsubstantiated expenses, the short answer to each of these complaints is found in the broad language of the Partnership agreement. The powers granted to the general partner in Sections 5.2(c), (d), (g), (k) and (1) more than amply authorize and permit any of the activities relating to the management fees (either in percentage, amounts paid or the entity to which payment was made), the legal fees (either in amount or purpose), and the relatively minor payments for work on the Property for which no invoices were provided. Thus, no breach of fiduciary duty occurred in the handling of any of these matters. Further, the broad exculpation and indemnification provisions in Article 9 relieve the general partner from any liability for these claims in the absence of proof— which was lacking here — of gross negligence, willful misconduct or fraud.[5]
The limited partners who brought this action certainly were frustrated about the amount, timing and manner in which they received information from the general partner. That frustration, however, cannot form the basis for the claims made because of the broad language of the Partnership agreement they signed. All that the general partner was required to do under Section 7.1 of the Partnership agreement was to maintain full and accurate books and records at the principal place of business of the Partnership and make those records available for inspection and examination by the partners. There was no evidence that Lockey ever sought such an inspection or that it was ever refused. Rather, Lockey asked for detailed explanations and back up material for actions taken and payments made by SNK as if he was conducting an accountant’s audit. This was more than what was required by the governing document.
The refinancing with Middlesex Bank in February of 2000 requires more detailed comment. By Section 5.3 of the Partnership agreement, the limited partners had the right to approve a borrowing such as this. Further, they had the right to have notice of any proposed refinancing delivered to them in advance. Although the agreement does not say how such notice must be delivered, this Court rules that it must be in written form. It was not, and no approval by the limited partners of the borrowing, or any waiver thereof by them by failing to file a written objection, was established. At the same time, the plaintiffs were aware that a substantial amount of funding was needed to refurbish the Property, and the only two sources discussed were a capital call, which the partners did not favor, and refinancing, which the partners did not in anyway oppose.
Significantly at this time, the refinancing that closed in February 2000 was at a lower rate than the original financing in 1994 and, although the larger amount of $850,000 was agreed to, only $477,000 has been drawn down to date. The total amount of the 1994 financing was $530,000. Consequently, at least until the drawdown of borrowing exceeds $530,000, none of the partners, general or limited, has any provable damages.
Next, although there was a claim that Kanodia failed to pay for his one unit of interest in the partnership, the documentation before the Court suggests that he did. No other evidence proving this charge was presented. On the record before the Court, therefore, the plaintiffs cannot be found to have met their burden of proof on this issue.
Lastly, the Court considers the plaintiffs’ claims in light of G.L.c. 109, Sec. 45. There, on application by a partner, the Court “may decree dissolution of a limited partnership whenever it is not reasonably practicable to carry on the business in conformity with the partnership agreement.” The mere discontent by some of the limited partners with the actions of the broadly-authorized general partner to manage the business does not provide proof of a reasonably practicable inability to carry on the business in conformity with the Partnership agreement here. The fact of disagreement between some of the limited partners and the general partner and challenges to some of its managerial practices, like similar kinds of disagreements that arise between beneficiaries and a trustee of a trust established to operate a company, are not sufficient bases for the exercise by the Court of the extraordinary power to dissolve the partnership or remove the general partner. See Edinberg v. Cavers, 22 Mass.App.Ct. 212, 220-28 (1986). “The mere existence of hostility between beneficiaries and a trustee does not necessarily require removal of the trustee.” Shear v. Gabovitch, 43 Mass.App.Ct. 650, 688 (1997).

ORDER FOR JUDGMENT

Based upon the findings of fact and rulings of law stated above, this Court orders the entry of judgment for the defendants on all counts of the plaintiffs’ second amended complaint.

 On March 16, 2001, Judge Botsford dismissed Count IV of the first amended complaint for legal reasons with which this Court is in full agreement. Since that time, this Court allowed the filing of a second amended complaint. The second amended complaint contains in Count IV the same c. 93A complaint. It shall be dismissed without further comment for the identical reasons stated in Judge Botsford’s memorandum.

 The Court characterizes this failure as “benign” because it may be cured simply by filing the reports in issue on a timely basis. See Sec. 100, third paragraph.

 The Court notes G.L.c. 109, Sec. 23(9) that contains provisions regarding the cessation of a general partner’s status similar to those in the Partnership agreement. Those statutory provisions are no more stringent or commanding than the provisions in the Partnership agreement itself.

 A different conclusion would appear warranted in a circumstance in which the Secretary of State declined the *257 application for revival or no application was made and no officer of the corporation continued to act as if there was no dissolution.

 Under these circumstances, there is no need or basis to attempt a veil-piercing look beyond SNK to its sole stockholder, Kanodia, for relief.